Wilburn S. BRUCE, Plaintiff-Appellant,

v.

FIRST FEDERAL SAVINGS AND
LOAN ASSOCIATION OF
CONROE, INC., Defendant-Appellee.

No. 87–2417.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1988.

Michael L. Atkinson, Atkinson & Associates, P.C., Conroe, Tex., for plaintiff-appellant.

Brian T. Hanlon, Phillips, King, Smith & Wright, P.C., Houston, Tex., for defendant-appellee.

Before CLARK, Chief Judge, GEE and RUBIN, Circuit Judges.

CLARK, Chief Judge:

This case involves a question of statutory construction. We hold that the word "and" in the antitying provision of 12 U.S.C.A. § 1464(q)(1) should be given a disjunctive rather than a conjunctive meaning. We also hold that the district court erred by dismissing the complaint for failure to state a claim upon which relief can be granted.

## I. Facts

When reviewing a case dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), the court accepts the nonmoving party's well pleaded allegations as true and construes them in a light most favorable to that party. *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 756 (5th Cir.1987). A dismissal will be affirmed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Guided by these principles, we recount the facts of this case.

First Federal Savings and Loan Association of Conroe, Inc. (First Federal) made three secured loans to Seven Coves Timeshare, Ltd. (Seven Coves) in the amounts of $850,000, $4,400,000 and $950,000. Wilburn S. Bruce, the general partner of Seven Coves, guaranteed each loan. The loans were structured so that Seven Coves would pay interest in installments and principal in a balloon payment at maturity. The May 20, 1983 loan of $4.4 million matured on November 20, 1984. First Federal granted Seven Coves a 180–day extension on the $850,000 loan and the $950,000 loan prior to their maturity. Bruce contends that from the time the $4.4 million loan was consummated an understanding existed between Seven Coves and First Federal that the $4.4 million loan would be similarly extended.

On October 25, 1984, Seven Coves made a $200,000 principal payment on the $850,-000 loan. In December 1984, with the $4.4 million loan in default, three officers of First Federal met with Bruce and the vice president of Seven Coves. Bruce alleges that the officers expressed a concern about a year end audit by the Federal Banking Examiners and disclosure of the default. Bruce maintains that the officers offered to extend the $4.4 million loan after the first of the year if additional interest was paid through the end of 1984.

On December 28, 1984, a First Federal officer told the vice president of Seven Coves to send a letter signed by Bruce advising First Federal that a "bookkeeping error" had been made and that the October 25 payment should have been applied to the $4.4 million loan. Seven Coves complied. The ensuing transfer of funds was sufficient to cover the interest due on the $4.4 million loan through the end of 1984.

After January 1, 1985, First Federal refused to execute a written extension of the $4.4 million loan. First Federal officers allegedly stated that they would not negotiate a written extension because they had been forced to "take out" all original participating lenders on the $4.4 million loan which put First Federal above the legal lending limit under federal law. When the parties discussed how to regain compliance with federal banking statutes and regulations, First Federal's officers suggested that if Seven Coves found a participating lender to finance $1 million of the outstanding $4.4 million loan a written extension would be consummated. First Federal later raised the amount of requested participation to $2 million.

Seven Coves secured the cooperation of a lender which agreed to participate with First Federal to the extent of $2 million. On April 10, 1985, Seven Coves notified First Federal's executive vice president who allegedly acknowledged that this participation would enable First Federal to extend or renew the $4.4 million loan. The next day, First Federal allegedly informed Seven Coves of its decision not to participate in the extension or to cooperate in the refinancing of the loan.

On November 18, 1986, Bruce filed this suit against First Federal in district court seeking damages in excess of $30 million. In addition to several state law causes of action, Bruce alleges that First Federal violated the antitying provision of the Thrift Institutions Restructuring Act, 12 U.S.C.A. § 1464(q)(1). The district court held that since the word "and" connects the three subsections of section 1464(q)(1), set out in Part II below, Bruce's failure to allege a violation of subsection (1)(A) required dismissal. In the alternative, the district court held that Bruce failed to state a claim under either subsection (1)(B) or (1)(C). Bruce appeals.

## II. Conjunctive versus Disjunctive

■ The antitying provision of the Thrift Institutions Restructuring Act (TIRA) provides as follows:

(1) An association shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain additional credit, property, or service from such association, or from any service corporation or affiliate of such association, other than a loan, discount, deposit, or trust service;

(B) that the customer provide additional credit, property, or service to such association, or to any service corporation or affiliate of such association, other than those related to and usually provided in connection with a similar loan, discount, deposit, or trust service; *and*

(C) that the customer shall not obtain some other credit, property, or service from a competitor of such association, or from a competitor of any service corporation or affiliate of such association, other than a condition or requirement that such association shall

reasonably impose in connection with credit transactions to assure the soundness of credit.

12 U.S.C.A. § 1464(q)(1) (Supp.1987) (emphasis added). TIRA expressly creates a private cause of action for those injured by violations of section 1464(q)(1). *Id.* § 1464(q)(3). Bruce alleges violations of subsections (1)(B) and (1)(C) which prohibit reciprocal and exclusive dealing arrangements. First Federal contends that Bruce's failure to allege a violation of subsection (1)(A), the prohibition of tying arrangements, is fatal to the complaint because the statute is written in the conjunctive.[1] Bruce maintains that the statute should be read in the disjunctive despite the use of the word "and."

■ When we construe a statute, "[o]ur objective ... is to ascertain the congressional intent and give effect to the legislative will." *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

A basic canon of statutory construction is that words should be interpreted as taking their ordinary and plain meaning. Although in interpretation of statutory language reference should first be made to the plain and literal meaning of the words, the overriding duty of a court is to give effect to the intent of the legislature. A statute should ordinarily be interpreted according to its plain language, unless a clear contrary legislative intention is shown.

*United States v. Scrimgeour,* 636 F.2d 1019, 1022–23 (5th Cir.1981) (citations omitted). Although "[t]he Supreme Court has given somewhat inconsistent instructions concerning the propriety of use of legislative history where the meaning of the words is plain on the face of the statute," it has looked to the statute's purpose where such meaning "produced an unreasonable result 'plainly at variance with the policy of the legislation as a whole.'" *Id.* at 1023

---

**1.** The terms "tying arrangement" and "antitying provision" refer generally to the tying, reciprocal and exclusive dealing arrangements described by subsections (1)(A)-(C). The context will make it clear when the word "tying" refers only to a subsection (1)(A) tying arrangement.

(quoting *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed.2d 1345 (1940)). The word "and" is therefore to be accepted for its conjunctive connotation rather than as a word interchangeable with "or" except where strict grammatical construction will frustrate clear legislative intent.[2] *Peacock v. Lubbock Compress Co.,* 252 F.2d 892, 894–95 (5th Cir.1958). *See generally* 1A N. Singer, Sutherland on Statutes and Statutory Construction § 21.14 (4th ed. 1980).

Prior to the adoption of TIRA, savings and loan associations were subject to 12 U.S.C.A. § 1972(1) (1980), the antitying provision of the Bank Holding Company Act Amendments of 1970 (BHCA).[3] Section 1972(1) was "intended to provide specific statutory assurance that the use of the economic power of a bank will not lead to lessening of competition or unfair competitive practices." S.Rep. No. 1084, 91st Cong., 2d Sess. 16, *reprinted in* 1970 U.S. Code Cong. & Admin.News 5519, 5535 [hereinafter S.Rep. No. 1084, *reprinted in* 1970 Cong. & Admin.News]. To achieve this end, section 1972(1) "proscribes tying, reciprocity, and exclusive dealing arrangements." *Id.* at 45, *reprinted in* 1970 Code Cong. & Admin.News 5558 (supplementary view of Sen. Brooke). Such arrangements have been traditional targets of antitrust law because of their potentially anticompetitive effects. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 10 & n. 15, 104 S.Ct. 1551, 1557 & n. 15, 80 L.Ed.2d 2 (1984); *Freidco, Ltd. v. Farmers Bank,*

---

**2.** In *United States v. Fisk,* 70 U.S. (3 Wall.) 445, 447, 18 L.Ed. 243 (1865), the Court stated that "to ascertain the clear intention of the legislature ... courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or.'" *See, e.g., De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 976, 100 L.Ed. 1415 (1956) (reading the word "or" to mean "and" in the phrase "widow, widower, or children"); *Swearingen v. United States,* 161 U.S. 446, 450, 16 S.Ct. 562, 563, 40 L.Ed. 765 (1896) (interpreting "obscene, lewd or lascivious" to describe "one and the same offense"); *United States v. Moore,* 104 F. 78, 78–79 (D.Ky.1900) (same); *United States v. Scrimgeour,* 636 F.2d 1019, 1021–24 (5th Cir.1981) (construing the word "or" in perjury statute to mean "and"); *United States v. Moore,* 613 F.2d 1029, 1038–45 (D.C. Cir.1979), *cert. denied,* 446 U.S. 954, 180 S.Ct. 2922, 64 L.Ed.2d 811 (1980) (same); *Peacock v. Lubbock Compress Co.,* 252 F.2d 892, 893–95 (5th Cir.), *cert. denied,* 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d 1147 (1958) (interpreting the phrase "ginning and compressing of cotton" to mean "the performance of either or both"); *United States v. Tot,* 131 F.2d 261, 264–65 (3d Cir.1942), *rev'd on other grounds,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943) (the word "and" in the phrase "by the action of an explosive and a firearm muffler or firearm silencer" does not mean "combined with"); *United States v. Cumbee,* 84 F.Supp. 390, 391 (D.Minn.1949) (reading "and" to mean "or" in the phrase "this subchapter and Part VIII" of another subchapter); *United States v. Mullendore,* 30 F.Supp. 13, 15 (N.D.Okla.1939), *appeal dismissed,* 111 F.2d 898 (10th Cir.1940) ("lands or money" interpreted to mean "lands and money"). *Cf. Union Cent. Life Ins. Co. v. Skipper,* 115 F. 69, 72 (8th Cir.1902) (interpreting the words "arising and accruing" as explanatory of one another rather than reading "and" to mean "or").

**3.** The antitying provision of BHCA provides:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; *or*

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

The Board may by regulation or order permit such exceptions to the foregoing prohibition as it considers will not be contrary to the purposes of this chapter.

12 U.S.C.A. § 1972 (1980) (emphasis added). BHCA also expressly creates a private cause of action for those injured by violations of section 1972(1). *Id.* § 1975.

499 F.Supp. 995, 1000 (D.Del.1980).[4] The wording of section 1972(1) and its legislative history indicates that Congress intended the statute to be read in the disjunctive.[5] Thus, a complaint states a claim under section 1972(1) by alleging violation of one or more subsections. *See, e.g., Swerdloff v. Miami Nat'l Bank,* 584 F.2d 54, 57 & n. 1 (5th Cir.1978) (claim stated by pleading violation of section 1972(1)(C)).

In 1982, Congress enacted TIRA in response to financial difficulties facing thrift institutions and the need to restructure the thrift industry. S.Rep. No. 536, 97th Cong., 2d Sess. 13, *reprinted in* 1982 U.S. Code Cong. & Admin.News 3054, 3067 [hereinafter S.Rep. No. 536, *reprinted in* 1982 Cong. & Admin.News]. With the adoption of TIRA, the antitying provision of BHCA no longer applied to savings and loan associations.[6] Section 1464(q)(1), however, was intended to subject federal thrift institutions "to anti-tying restrictions generally comparable to those applicable to bank holding companies." S.Rep. No. 536, at 17, *reprinted in* 1982 Cong. & Admin. News 3071; *see also id.* at 55, *reprinted in* 1982 Cong. & Admin.News 3109. Although TIRA and BHCA prohibit essentially the same three types of arrangements,[7] BHCA connects its subsections with the word "or" while TIRA connects its subsections with the word "and." Senate Report No. 536, despite being accompanied by a bill using the word "and,"[8] expresses an understanding that a violation occurs whenever an association engages in conduct proscribed by any one of TIRA's three antitying subsections.

> The [antitying] provision prohibits an association from conditioning the availability or the terms of credit, property or services on a potential customer's agreement to:

which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U.S.C.A. § 1841(c) (1980) (amended 1982); *see also* 12 U.S.C.A. § 1971 (1980). TIRA excepts from BHCA "an institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation or an institution chartered by the Federal Home Loan Bank Board." 12 U.S.C.A. § 1841(c) (Supp.1987). The antitying provision of TIRA applies to "an association" which is defined as "a Federal savings and loan association or a Federal savings bank chartered by the [Federal Home Loan Bank] Board." 12 U.S.C.A. § 1462(d) (Supp. 1987).

---

**4.** Reciprocal agreements prohibited by section 1972(1)(C)-(D) and section 1464(q)(1)(B) may not be directly analogous to reciprocal agreements prohibited by antitrust law. *See Freidco,* 499 F.Supp. at 1001 n. 5.

**5.** The language of the bill makes clear that the availability to a potential customer of any credit, property, or service of a bank may not be conditioned upon that customer's use of any other credit, property, or service offered by the bank, the bank holding company or its subsidiary or by a business operated by one or more of the persons controlling the bank; upon the provision by such customer of any other credit, property, or service to the bank, the bank holding company or its subsidiary or to a business operated by one or more of the persons controlling the bank; *or* that the potential customer shall not obtain some other credit, property, or service from a competitor of the bank, the bank holding company or any other subsidiary, or from a competitor of a business operated by one or more of the individuals controlling the bank.

   The purpose of this provision is to prohibit anti-competitive practices which require bank customers to accept *or* provide some other service or product *or* refrain from dealing with other parties in order to obtain the bank product or service they desire.
   S.Rep. No. 1084 at 16–17, *reprinted in* 1970 Cong. & Admin.News 5535 (emphasis added); *see also id.* at 45, *reprinted in* 1970 Cong. & Admin.News 5558 (supplementary view of Sen. Brooke).

**6.** Banks originally subject to the antitying provision of BHCA included "any institution ...

**7.** Section 1464(q)(1)(A) parallels section 1972(1)(A) & (B), section 1464(q)(1)(B) parallels section 1972(1)(C) & (D) and section 1464(q)(1)(C) parallels section 1972(1)(E).

**8.** *See* S. 2879, 97th Cong. 2d Sess. § 331 (1982). Although this was the first TIRA bill to include an antitying provision, it mirrors the adopted provision, 28 U.S.C.A. § 1464(q)(1). Neither earlier house bills nor earlier senate bills included an antitying provision. *See, e.g.,* H.R. 4724, 86th Cong. 2d Sess. (1981); S. 1720, 96th Cong. 2d Sess. (1981). The house bill that Congress enacted was amended to include the antitying provision of Senate Bill 2879. *See* H.R. Conf.Rep. No. 899, 97th Cong. 2d Sess. 85 (1982); S.Conf.Rep. No. 641, 97th Cong. 2d Sess. 85 (1982), *reprinted in* 1982 Cong. & Admin. News 3128 (same); *see also id.* at 37, § 331 (reprinting H.R. 6267, 97th Cong. 2d Sess. § 331 (1982)).

a. Obtain other credit, property, or services from the association, its service corporation or affiliates;

b. Provide other property, credit, or services to the association, its service corporation or affiliates; *or*

c. Refrain from obtaining other credit, property or services from a competitor of the association, its service corporation or affiliates.

In each case, the thrift institution may require appropriate conditions necessary for the soundness of the transaction. In sum, this provision is intended by the Committee to preclude anticompetitive practices where customers are required to accept *or* provide another service or product *or* to refrain from dealing with other parties in order to obtain the product or service that they want from the association.

*Id.* at 17, *reprinted in* 1982 Cong. & Admin.News 3071 (emphasis added).

To give a conjunctive meaning to the word "and" in section 1464(q)(1) would be to create an altogether different prohibition from section 1972(1), the professed paradigm of TIRA's antitying provision. *Compare United States v. Moore*, 613 F.2d 1029, 1042 (D.C.Cir.1979). Congressional discussion never deviated from the understanding that TIRA basically incorporated BHCA's antitying provision.[9] "At no time did anyone dispute an intended identity between the two statutes in this regard, or reflect a conscious comprehension of a significant difference." *Id.* Aside from the wording of the statute, we have found no evidence that Congress intended to switch from the disjunctive in BHCA to the conjunctive in TIRA. Indeed, all of the evidence reveals that Congress specifically did not intend such a departure.

First Federal argues that section 1464(q)(1) should be given a literal reading because Congress adopted TIRA to help an ailing thrift industry. But Congress expressed its desire to aid the thrift industry by expanding an association's "range of lending and related investment activities," not by effectively neutering the established

proscription against tying arrangements. S.Rep. No. 536, at 13, *reprinted in* 1982 Cong. & Admin.News 3067.

First Federal also argues that "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1978). But to read the word "and" in the disjunctive is to give the word its clearly intended effect. To read it in the conjunctive would nullify legislative intent. The proscriptive force of the statute would wither if an association could be held to violate section 1464(q)(1) only in the unlikely circumstance it imposed three distinct types of conditions amounting to three distinct types of tying arrangements.

The polestar that must guide a court in the task of construing a statute is congressional intent. Analysis of section 1464(q)(1), section 1972(1) and their legislative histories demonstrates that strict grammatical construction of section 1464(q)(1) would frustrate the clear intent of Congress. Section 1464(q)(1)(A)–(C) must be read in the disjunctive.

## III. Section 1464(q)(1)(B) & (C)

### A. Section 1464(q)(1)(B) and Anticompetitiveness

Bruce alleges that First Federal conditioned extension of credit on his authorizing the transfer of the $200,000 principal payment on the $850,000 loan to an interest payment on the $4.4 million loan. Bruce also alleges that First Federal conditioned extension or refinancing of the $4.4 million loan upon participation by another lender. In both instances, according to Bruce, First Federal violated section 1464(q)(1)(B) by extending credit on the condition that the customer provide an additional service other than that usually provided in connection with a similar loan. The district court, citing *Parsons Steel v. First Alabama Bank*, 679 F.2d 242, 245 (11th Cir.1982), held that although both alleged violations of section 1464(q)(1)(B) "may constitute an unusual service to the bank," Bruce failed

---

**9.** *See supra* note 8 and accompanying text.

to state a claim because neither act "appears anti-competitive."

The district court justified its reliance on *Parsons*, a case involving an alleged violation of section 1972(1), by noting that BHCA's antitying provision is "identical to § 1464(q)(1)(B)." Of course this is so. Not only are the provisions parallel, but TIRA's legislative history ties it closely to the BHCA.

■ Our concern is that the district court may have reached outside the language of section 1464(q)(1) for its requirement of anticompetiveness. For a tying arrangement to constitute a *per se* violation of § 1 et seq. of the Sherman Act, 15 U.S.C.A. § 1 et seq. (1980), it must be established (1) that the defendant possesses market power over the tying product to force purchase of the tied product and (2) that "a substantial volume of commerce is foreclosed thereby." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–16, 104 S.Ct. 1551, 1559–60, 80 L.Ed.2d 2 (1984). BHCA obviates the need to make these two showings to establish that a bank has engaged in an illegal tying arrangement.[10]

■ As Part II of this opinion demonstrates, Congress intended to treat claims under section 1464(q)(1) in the same basic manner as claims under section 1972(1).

To state a claim under section 1464(q)(1)(B) the language of the statute requires that an association (1) "extend credit" (2) "on the condition" (3) "that the customer provide additional ... service" to the association. Bruce satisfies the extension of credit requirement by alleging that First Federal orally agreed to extend or refinance the loan. First Federal allegedly conditioned this extension of credit upon the transfer of a principal payment on one loan to pay interest on another loan and on the participation of other lenders. Bruce alleges that both of these conditions constitute an "additional service." Under a proper Rule 12 analysis, the district court should not have dismissed Bruce's section 1464(q)(1)(B) claims for failure to allege that the purported arrangement was anticompetitive.

We express no view on whether the conditions imposed by First Federal are appropriate traditional banking practices or "related to and usually provided in connection with a similar loan."[11] 12 U.S.C.A. § 1464(q)(1)(B). We hold only that the claim alleged cannot be dismissed on the pleadings for the reason given by the district court.

### B. Section 1464(q)(1)(C) and the No-Other-Credit Requirement

■ Bruce alleges that First Federal refused to refinance the $4.4 million loan

---

**10.** [T]ying arrangements involving a bank are made unlawful by this section without any showing of specific adverse effects on competition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service. Moreover, as individual tying arrangements may involve only relatively small amounts, the prohibitions of this section are applicable regardless of the amount of commerce involved.

S.Rep. No. 1084, at 45, *reprinted in* 1970 Cong. & Admin.News 5558 (supplementary view of Sen. Brooke); *see also Parsons*, 679 F.2d at 246 (11th Cir.1982); *Costner v. Blount Nat'l Bank*, 578 F.2d 1192, 1196 (6th Cir.1978); *Sharkey v. Security Bank & Trust Co.*, 651 F.Supp. 1231, 1232 (D.Minn.1987); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 556 n. 9 (S.D.N.Y. 1985); *Freidco, Ltd. v. Farmers Bank*, 499 F.Supp. 995, 1000 & n. 4 (D.Del.1980). Some courts have required a BHCA plaintiff to show anticompetitive effect. *See, e.g., Federal Deposit Ins. Corp. v. Linn*, 671 F.Supp. 547, 561–62 (N.D.

Ill.1987). We note that the *Linn* court could have rested its dismissal solely on its holdings that the section 1972(1)(C) claims involved appropriate traditional banking practices and that the conditions imposed were "related to and usually provided in connection with a loan." *Id.* at 562–63.

**11.** Congress made it clear that neither BHCA nor TIRA was intended to interfere with appropriate traditional banking or lending practices. *See* S.Rep. No. 1084, at 16, *reprinted in* 1970 Cong. & Admin.News 5535; S.Rep. No. 536, at 17, *reprinted in* 1982 Cong. & Admin.News 3071. In *Shulman v. Continental Bank*, 513 F.Supp. 979, 984 (E.D.Pa.1981), a bank argued with respect to a junior participation agreement that "a requirement that a potential borrower acquire capital from other sources is not an unusual banking practice, and therefore, as a matter of law," the arrangement did not violate section 1972(1)(C). The court, however, decided the case on other grounds. *Id.*

after he had found an institution willing to participate to the extent of $2 million. Bruce contends that this refusal amounts to a requirement that he not obtain credit from the lender who was willing to participate and that this violated subsection 1464(q)(1)(C). This subsection prohibits extension of credit on the condition that a customer not obtain some other credit from a competitor. The district court, citing *Exchange National Bank v. Daniels*, 768 F.2d 140, 143–47 (7th Cir.1985), dismissed this claim.

We agree that Bruce fails to state a claim under section 1464(q)(1)(C). To state a claim under this section the extension of credit must be tied to a requirement "that the customer not obtain some *other* credit … from a competitor." 12 U.S.C.A. § 1464(q)(1)(C) (emphasis added). Bruce cannot establish the existence of such a tied product. Had First Federal refinanced the loan without participation, a competitor could not have provided credit with respect to the refinancing of that loan. Such a transaction would not amount to a requirement that the customer not obtain some *other* credit from a competitor. Here, First Federal's offer to refinance the loan if a participating lender could be found may constitute an extension of credit. But no "other credit" was proscribed by First Federal's decision not to refinance. First Federal had to decide how much of the loan it would carry and how much participation would be required from a competing creditor. That First Federal initially conditioned refinancing on participation and then refused to refinance once participants were found only indicates that First Federal changed its mind. The refusal to refinance cannot amount to a requirement that Bruce not obtain some other credit.

Bruce argues that the refusal to refinance after he found a willing participant was prompted by an inter-creditor agreement between First Federal and an original participating lender that made it more advantageous to foreclose than to refinance. Assuming this is so and that federal or state law may prohibit such conduct, Bruce's allegations still fail to meet the no-other-credit requirement. Section 1464(q)(1) was not intended to serve as a general regulatory statute.[12] We affirm the district court's dismissal of Bruce's section 1464(q)(1)(C) claim.

### IV. Conclusion

The district court erroneously held that section 1464(q)(1) should be read in the conjunctive. It must be read in the disjunctive. We reverse the district court's dismissal of Bruce's section 1464(q)(1)(B) claims, but affirm the dismissal of his section 1464(q)(1)(C) claim. The judgment appealed from is

AFFIRMED, in part and, in part, REVERSED.

---

**12.** *Compare Parsons*, 679 F.2d at 245 (section 1972(1) was not intended as a general regulatory statute "intruding upon recognized state authority over the banking process"); *see also Freidco*, 499 F.Supp. at 1001.