**AMERIFIRST PROPERTIES, INC.,**
Plaintiff–Appellant,

v.

**FEDERAL DEPOSIT INSURANCE CORP. (Receiver for Western Bank—Westheimer), Defendant–Appellee.**

No. 87–2963.

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1989.

Wayne A. Risoli, Leymon L. Solomon, Honigman, Miller, Schwartz & Cohn, Houston, Tex., for plaintiff-appellant.

Stephen W. Lemmon, Thomas A. Collins, Mark Browning, Bernard Wm. Fischman, Denise L. Evans, Atty., FDIC, Houston, Tex., for defendant-appellee.

Before KING, WILLIAMS and SMITH, Circuit Judges.

KING, Circuit Judge:

The plaintiff-appellant brought suit against the defendant-appellee for violating the antitying provision of the Bank Holding Company Act Amendment. The defendant-appellee filed a motion to dismiss for failure to state a claim, Fed.R.Civ.P. 12(b)(6), and the district court granted it. Finding that the district court erred in concluding (1) that a loan must actually be funded in order to satisfy the meaning of "extended credit" under 12 U.S.C. § 1972(1)(A) (1980) and (2) that the plaintiff-appellant failed to show that it had standing to sue, we reverse the district court and remand the case for further proceedings.

## I.

Since all facts alleged by an appellant in its complaint are considered true on a review of a dismissal on a rule 12(b)(6) motion, *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *National Enters. v. Mellon Fin. Servs. Corp.*, 847 F.2d 251, 252 (5th Cir.1988), we set forth the facts as alleged by the plaintiff-appellant, Amerifirst Properties, Inc. ("Amerifirst"), in its complaint.[1] In April of 1986, Amerifirst commenced negotiations with the defendant-appellee, Western Bank–Westheimer (the "Bank"), for a $5,792,496 development loan. The loan was for the development of a real estate project known as Langham Chase (the "project"). The Bank subsequently informed Amerifirst that the development loan had been approved but that due to liquidity problems, the Bank was unable to issue a written commitment at that time. The Bank, however, did approve a six-month loan of $225,000 for the initial engineering and bridge costs of the project. The Bank funded this six-month loan on July 7, 1986, and represented to Amerifirst that the $225,000 was a "first draw" on the development loan.

During the time period when the Bank and Amerifirst were negotiating the development loan, the Bank held a seminar for potential investors in order to sell some of its "other real estate owned" ("ORE"). The Bank invited Amerifirst to this seminar. On or about August 19, 1986, Amerifirst submitted a revised development loan application in which it provided additional equity for the development loan by stating that Amerifirst would draw funds to purchase certain ORE from the Bank. The Bank suggested that Amerifirst consider a more expensive piece of ORE, known as "Lost Timbers," because the size of the Lost Timbers project would make the development loan more beneficial to the Bank and more likely for approval by the Bank. Amerifirst then revised its loan package request and proposed to borrow money to purchase Lost Timbers. The Bank verbally agreed to the revised loan package and requested some documentation on the project, which Amerifirst provided.

The Bank issued a development loan commitment ("loan commitment") on October 22, 1986, in which it agreed to a development loan of $5,593,500 to Amerifirst subject to certain conditions. One such condition was that the loan commitment was "subject to the purchase of certain ORE properties under negotiation with the borrower." Upon Amerifirst's request, the Bank made certain modifications to the loan commitment, and Amerifirst accepted the loan commitment on November 21, 1986. On February 3, 1987, however, the Bank informed Amerifirst that it had committed to selling Lost Timbers to a third party and that because Lost Timbers was sold and no other ORE was available for sale, the Bank could not fund the development loan. On February 5, 1987, the Bank informed Amerifirst that it was rescinding its loan commitment.

On May 5, 1987, Amerifirst filed suit against the Bank, alleging a violation of the antitying provision, 12 U.S.C. § 1972(1)

---

**1.** Although summary judgment evidence exists in the record, the district court's order indicates, if not explicitly states, that it relied only upon Amerifirst's complaint and not upon the summary judgment evidence in dismissing Amerifirst's case. We therefore assume that the district court granted a 12(b)(6) motion and did not convert the dismissal motion into a motion for summary judgment as allowed by Federal Rule of Civil Procedure 12(b).

(1980), of the Bank Holding Company Act Amendment ("BHCAA") and several violations of state law. On June 1, 1987, the Bank filed a petition for removal to federal district court, and the motion was granted. The Bank subsequently filed a motion to dismiss, pursuant to rule 12(b)(6), for failure to state a tying claim under the BHCAA. On July 23, 1987, the district court granted the Bank's motion to dismiss, reasoning that Amerifirst had failed to state a tying claim under the BHCAA because (1) the Bank never actually extended credit to Amerifirst since the loan was never consummated and (2) the facts that Amerifirst pled in its complaint did not support Amerifirst's "conclusory allegation" that its injuries were a direct consequence of the alleged tying violation. Because the remaining claims were state law claims, the district court remanded the case to state court. Amerifirst filed timely notice of appeal.[2]

## II.

As previously mentioned, we consider all facts alleged by Amerifirst in its complaint to be true. *Cruz*, 405 U.S. at 322, 92 S.Ct. at 1081; *National Enters.*, 847 F.2d at 252. Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted).

### A. *Extension of Credit*

Section 1972(1)(A) states: "A bank shall not in any manner extend credit ... on the condition or requirement—(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service...." 12 U.S.C. § 1972(1)(A).[3] The district court dismissed Amerifirst's complaint on the ground that the Bank never extended credit to Amerifirst because the loan was not consummated. The issue therefore becomes whether a loan commitment constitutes "extending credit" within the meaning of section 1972(1)(A) when the loan is never actually funded. Since the term "extend credit" is not defined by the statute itself, we turn to legislative history and to case law.

The Senate Report, discussing tying arrangements under the BHCAA, states: "The language of the bill makes clear that the *availability* to a potential customer of any credit, property, or service of a bank may not be conditioned upon that customer's use of any other credit, property, or service offered by the bank...." Senate Comm. on Banking and Currency, Bank Holding Company Act, S.Rep. No. 1084, 91st Cong., 2d Sess. (1970) (emphasis added), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5519, 5535. The word availability in the legislative history certainly indicates that Congress intended the term "extend credit" to include loan commitments in which the loan was eventually never funded.

The Senate Report also states that the antitying provision "is intended to provide specific statutory assurance that the use of the economic power of a bank will not lead to a lessening of competition or unfair competitive practices." *Id.* Citing this legislative history, the court in *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542 (S.D.N.Y.1985), stated:

Nowhere does the legislative history or the language of the BHCA define the term "extension of credit." That term must be construed to accord with the underlying purpose of the anti-tying provisions. A particular practice should be

---

**2.** On October 1, 1987, the Texas State Banking Commissioner declared the Bank insolvent and appointed the Federal Deposit Insurance Corporation ("FDIC") as the receiver for the Bank. On February 23, 1988, the FDIC filed a motion to substitute itself as the real party in interest in the present lawsuit, and on March 2, 1988, we granted the motion. For the purpose of this appeal, however, we will continue to refer to the Bank as the defendant-appellee.

**3.** 12 U.S.C. § 1975 (1980) provides the vehicle by which a person who is injured by a violation of section 1972 brings suit. For the wording of section 1975, see *infra* II.B.

considered an "extension of credit" if it manifests the improper use of economic leverage that the Act seeks to prevent. *Id.* at 554. We agree that such an interpretation of "extension of credit" is consistent with Congress' intent. Clearly, the conditioning of a loan upon Amerifirst's purchase of the Bank's ORE was an "improper use of economic leverage that the Act seeks to prevent," *id.*, and the ultimate non-funding of the loan by the Bank did not alleviate this economic leverage.

This conclusion is also supported by the applicable case law. The bank in *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54 (5th Cir.1978), conditioned the continuation of a loan arrangement upon the transfer, by the two 100% shareholders of the corporation, of 51% of the capital stock to one of the bank's customers. The two stockholders refused to transfer the stock, and the bank retaliated by terminating the financial arrangement. In reversing the district court's grant of a motion for a judgment on the pleadings, Fed.R.Civ.P. 12(c), we stated:

> [T]he bank *discontinued* the corporation's credit in retaliation for the [shareholders'] refusal to comply with its demand. *Simply by demanding* that the [shareholders] sell their stock, however, the bank violated the statutory prohibition. Even if the [shareholders] had sold their stock, the bank had continued the loan, and the corporation had prospered, the plaintiffs might still have had a cause of action under § 1975 for any damages they incurred.

*Id.* at 60 (emphasis added). Obviously, the bank in *Swerdloff* did not fund the latter loans—the loans which were tied to the transfer of the stock. Yet, we concluded that the bank had violated section 1972(3)[4] simply by demanding the sale of the stock. Regardless of whether the tie was actually consummated[5]—the stock was actually sold—or whether the remainder of the loans was actually funded, the bank violated the antitying provision of the BHCAA.

Our holding in *Swerdloff* further bolsters our conclusion that the Bank extended credit to Amerifirst when we consider the Bank's six-month loan of $225,000 to Amerifirst. Taking Amerifirst's allegation as true that the $225,000 was a "first draw" on the $5,792,496 development loan, we find the financial arrangement in *Swerdloff* to be analogous to the one in the present case. In *Swerdloff*, the bank had already funded some of the loans but had refused to extend additional funds unless the shareholders complied with the tying arrangement. As in *Swerdloff*, the Bank in the present case funded, or loaned, Amerifirst $225,000 as the "first draw" on the loan but refused to agree to a loan commitment for the remaining portion of the loan unless Amerifirst agreed to buy Lost Timbers.[6]

■ In a more recent opinion, we addressed the antitying provision, 12 U.S.C. § 1464(q)(1) (Supp.1989), of the Thrift Institutions Restructuring Act ("TIRA"). *Bruce v. First Fed. Sav. and Loan Ass'n*, 837 F.2d 712 (5th Cir.1988).[7] In *Bruce*, we

---

**4.** Section 1972(3), the predecessor of section 1972(1)(c), states:

A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(3) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

Consequently, section 1972(3) is the equivalent of section 1972(1)(A) for the purpose of defining the term "extend credit."

**5.** We note that the tie was never consummated in *Swerdloff* to refute the Bank's argument that

Amerifirst has failed to state a claim because Amerifirst was never injured since the tie in the present case was never consummated. The Bank reiterates this argument in its later assertion that Amerifirst lacks standing to sue. *See infra* note 11.

**6.** The district court rejected a similar argument because the "first draw" of $225,000 predated the tying arrangement. In *Swerdloff*, however, the funded loans predated the tying arrangement involving the "additional funds."

**7.** The TIRA is the BHCAA's equivalent for savings and loan associations. The antitying provision of the TIRA parallels the antitying provision of the BHCAA.

held that "Bruce [the plaintiff] satisfies the extension of credit requirement by alleging that First Federal orally *agreed* to extend or refinance the loan." *Id.* at 718 (emphasis added). Thus, the bank's agreement, regardless of its actual performance concerning the agreement, was enough to satisfy the requirement that a bank "extend credit." We also stated in *Bruce* that "First Federal's *offer* to refinance the loan if a participating lender could be found may constitute an extension of credit." *Id.* at 719 (emphasis added). The language in *Bruce* indicates that an *offer* of a tied loan satisfies the term "extension of credit" and is not dependent upon the fate of the actual loan itself.

Considering both the legislative history and the applicable case law, we conclude that the Bank's agreement to fund Amerifirst's loan, regardless of whether the Bank ultimately funded the loan, constitutes "extending credit" under section 1972(1)(A). We therefore reverse the district court on this ground.

## B. *Standing to Sue*

Section 1975 states that "[a]ny person who is injured in his [or her] business or property by reason of anything forbidden in section 1972 in this title may sue therefor in any district court of the United States...." 12 U.S.C. § 1975. The district court dismissed Amerifirst's claim on the alternative ground that Amerifirst failed to demonstrate that its injuries were a direct consequence of the tying violation, i.e., that Amerifirst lacked standing to sue.[8] In *Swerdloff*, however, we held:

> Since the Swerdloffs [the shareholders] are customers of the bank and the prohibited additional services have been demanded of them by the bank, there is no question that they have standing to sue for the § 1972(3) violations.
>
> ... Any injury to the Swerdloffs, the bank's customers, could be redressed under § 1975, whether or not there had been damage to the corporation.

*Swerdloff*, 584 F.2d at 60. Relying on the above language, our inquiry becomes whether Amerifirst is a customer of the Bank.[9] If Amerifirst is a customer, then Amerifirst has standing to sue under section 1975 for a section 1972(1)(A) violation.[10] The Bank argues that Amerifirst is not a customer, but we are unpersuaded.

First, we indicated in *Swerdloff* that a corporation which contracts with a bank for a loan, such as Amerifirst did, is a customer. Stanford was the corporation in *Swerdloff* to which the bank agreed to lend money with the requirement that the shareholders personally guarantee the loan. We stated that "Standard clearly constituted a customer...." *Id.* at 59. We also held in *Swerdloff* that the two 100% shareholders

**8.** The district court relied on *Campbell v. Wells Fargo Bank*, 781 F.2d 440 (5th Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986), to support its conclusion. *Campbell*, however, addressed the issue of whether *non-customers* of a bank have standing to sue a bank for tying violations. We concluded in *Campbell* that although non-customers do not lack standing to sue per se, the plaintiff's injuries in *Campbell* were not a direct consequence of the tying arrangement and that, therefore, the plaintiff lacked standing. *Campbell*, however, does *not* hold that bank *customers* must show that a "direct consequence" exists between its injury and the tying arrangement. We noted in *Campbell* that both parties agreed "that these cases [*Swerdloff*, 584 F.2d 54; *Costner v. Blount Nat'l Bank*, 578 F.2d 1192 (6th Cir.1978)] both hold, in effect, that plaintiffs who deal directly with a bank possess standing to sue for violations of § 1972." *Campbell*, 781 F.2d at 442. We also stated in *Campbell* that "we find no evidence that Congress intended for bank customers

alone to have standing under § 1975, [but] [i]t may very well be that, under general principles of standing, most non-customer injuries will be too remote to furnish a basis for recovery under the act." *Id.; see also Omega Homes, Inc. v. Citicorp Acceptance Co.*, 656 F.Supp. 393, 403 (W.D. Va.1987) (court stated that plaintiff's argument that an allegation of injury is sufficient for BHCAA standing may be true when plaintiff alleges that it is a customer of the bank—court cited *Swerdloff* ).

**9.** The Bank does not contest that Amerifirst has alleged a prohibited demand by the Bank that Amerifirst purchase property.

**10.** The Bank concedes that courts have found that bank customers have standing to sue per se under the BHCAA for alleged tying violations. As previously noted, *see supra* note 8, *Campbell* and *Omega* both imply that *Swerdloff* stands for such a proposition.

were customers and stated: "Where, as here, there has been a direct relationship between the bank and purported customer, as well as privity of contract with the bank, it is reasonable to conclude that a customer relationship exists." *Id.* As Amerifirst had both a direct relationship and privity of contract with the bank, we conclude that Amerifirst was indeed a customer of the Bank and therefore has standing to sue.[11]

### C. *Anticompetive Effects*

█ Finally, the Bank argues that Amerifirst has not alleged an antitrust injury, or shown anticompetive effects, which is a requirement under the antitying provision of the BHCAA. The Bank cites *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) in support of its argument. *Brunswick,* however, dealt strictly with the antitrust laws—the BHCAA was not mentioned. Furthermore, we held in *Bruce* that the "BHCAA obviates the need to make [anticompetive] showings to establish that a bank has engaged in an illegal tying arrangement."[12] *Bruce,* 837 F.2d at 718; *see also Parsons Steel, Inc. v. First Alabama Bank,* 679 F.2d 242, 245 (11th Cir.1982); *Costner,* 578 F.2d at 1196; *Sharkey v. Security Bank & Trust Co.,* 651 F.Supp. 1231, 1232 (D.Minn.1987); *Nordic Bank PLC,* 619 F.Supp. at 556 n. 9; *Freidco, Ltd. v. Farmers Bank,* 499 F.Supp. 995, 1000 & n. 4 (D.Del.1980); *but see Davis v. First Nat'l Bank,* 868 F.2d 206, 208–09 (7th Cir.1989) (regardless of "this 'relaxed' *per se* approach [in the legislative history] to banking tie-ins, a plaintiff seeking relief under section 1972 must still complain of a practice that is anticompeti-

tive"—further language in the opinion at least suggests that a plaintiff must show anticompetive effects). Based on the legislative history of the BHCA, *see supra* note 12, and on case authority, we conclude that Amerifirst does not have to make a showing of anticompetitive effects in order to state a tying claim under the BHCAA.

### III.

For the foregoing reasons, we conclude that the term "extend credit" in section 1972(1)(A) includes a loan commitment in which a bank never actually funds the loan. We further hold that Amerifirst is a customer within the meaning of section 1972(1)(A) and that therefore Amerifirst has standing to sue the Bank for a tying violation under the BHCAA. Finally, we determine that Amerifirst is not required to show anticompetitive effects in order to state a claim under the BHCAA. We therefore REVERSE the district court's grant of the Bank's motion to dismiss pursuant to rule 12(b)(6) and REMAND the case to the district court for further proceedings.

---

**11.** The Bank also argues that Amerifirst lacks standing to sue because it suffered no injury from the tie because the tie was never consummated. As we previously noted, *see infra* II.A. & note 5, the tie was never consummated in *Swerdloff,* yet we held that the shareholders had standing to sue. We therefore reject the Bank's argument.

**12.** In drawing this conclusion in *Bruce,* we quoted the legislative history of the BHCA as follows:

> [T]ying arrangements involving a bank are made unlawful by this section without any showing of specific adverse effects on compe-

tition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service. Moreover, as individual tying arrangements may involve only relatively small amounts, the prohibitions of this section are applicable regardless of the amount of commerce involved.

Senate Comm. on Banking and Currency, Bank Holding Company Act, S.Rep. No. 1084, 91st Cong., 2d Sess (1970), *reprinted in* 1970 U.S. Code Cong. & Admin.News 5558 (supplementary views of Sen. Brooke).