United States Court of Appeals,

Fifth Circuit.

No. 91-4105.

GULF STATES LAND & DEVELOPMENT, INC., et al.,
Plaintiffs-Appellants,

v.

PREMIER BANK N.A., et al., Defendants-Appellees.

March 31, 1992.

Appeals from the United States District Court for the Western
District of Louisiana.

Before THORNBERRY, GARWOOD, and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

The Plaintiffs sued Defendant Premier Bank for violations of
the Bank Holding Company Act, the Sherman and Clayton Acts, and the
Louisiana Antitrust Statute. The district court found that the
Plaintiffs failed to establish essential elements of their claims,
and granted summary judgment in favor of the Defendant. We affirm.


Background


On October 13, 1986, Plaintiffs Stanley Palowsky, Carol
Palowsky, Dr. John Smiarowski, Larry James, Dianne James, Walter
Meredith, and Mona Meredith purchased a piece of property to be
developed as a subdivision known as North Pointe. These Plaintiffs
(together, the "Gulf States Plaintiffs") later formed Gulf States
Land & Development, Inc. to develop the property. Defendant
Premier Bank's predecessor, Ouachita National Bank, financed the
purchase of the property and made a commitment to provide a

development loan. The Plaintiffs' claims against Premier Bank arise out of the Bank's involvement in the Plaintiffs' purchase of the North Pointe property and several related transactions, and Premier Bank's later refusal to continue funding the development loan.

Two of the Plaintiffs, Dr. Smiarowski and Mr. Palowsky, were involved in a number of joint businesses and investments with Dr. Lee Roy Joyner, some of which involved Premier Bank as a creditor. Joyner and Smiarowski, together as J & S Pecan Farms, owned the tract of land (the "North Pointe tract") that was later sold to the Gulf States Plaintiffs. This tract of land was mortgaged by J & S to Premier Bank for $1.3 million. The J & S Partnership also owned another tract of land known as the Williams Orchard, which was mortgaged to lenders other than Premier Bank.

Joyner, Smiarowski, and Palowsky together owned several additional pieces of property. They were joint owners of a tract of land in Arkansas, held free of debt. In addition, all three were partners in the Reviens Partnership, which owned real estate on which Premier Bank held a second mortgage. Finally, both Joyner and Palowsky were part owners of several tracts of land known as the Interchange property, also mortgaged to Premier Bank.

In 1985, Dr. Joyner had a falling out with his business partners. He was also experiencing financial difficulties and was getting divorced from his wife, Nancy Joyner. The J & S loan on

the North Pointe property was in default, as was Joyner's other debt at Premier Bank. All of the parties involved in the different business ventures, including Premier Bank, thought it desirable to separate Dr. Joyner's interests from his partners and restructure the parties' indebtedness to Premier Bank.

Plaintiffs James and Meredith expressed interest in purchasing the North Pointe tract to develop as a subdivision. They acquired an option to purchase the tract for $1.3 million, the amount of J & S's outstanding debt on the property, and they attempted to obtain government financing of the purchase. When this financing arrangement fell through, the parties began negotiating a purchase to be financed by Premier Bank; however, James and Meredith did not have sufficient financial strength to obtain the financing on their own. Smiarowski agreed to participate as a purchaser, and Palowsky either agreed or was blackmailed by Mr. Whitfield Hood, an executive vice president at Premier Bank, to participate. The purchase price was fixed at $800,000, and the Bank agreed to fund a development loan.

A number of transactions between Joyner, Palowsky, and Smiarowski were negotiated at the same time, and all of the transactions closed on October 13, 1986. With regard to the North Pointe transaction, Mr. Hood issued a loan commitment letter to the Gulf States Plaintiffs for $2.868 million, of which $800,000 covered the purchase price of the North Pointe property. The Bank released both Joyner and Smiarowski from the $1.3 million J & S

loan secured by the property. The Joyners transferred their partnership interest in the Williams Orchard property to Smiarowski, and he assumed all of the J & S Partnership debt on that property.

The Joyners transferred their interest in the Interchange property, as well as their debt to Premier Bank secured by that interest, to Palowsky. Palowsky and Smiarowski transferred their partnership interests in Reviens Partnership to Dr. Joyner, and Dr. Joyner assumed their liability to Premier Bank on those partnership interests. The Bank required Dr. Joyner to pledge the newly-acquired Reviens partnership interests to the Bank as security for his other loans then in default. Approval of this transfer by the other Reviens partners took some time; while approval was pending, Smiarowski and Palowsky pledged the interests to the Bank. Finally, Palowsky and Smiarowski transferred their interest in the Arkansas property, owned jointly by Smiarowski, Palowsky and Joyner, to Nancy Joyner.

These transactions form the basis of the Plaintiffs' Bank Holding Company Act claims. The Plaintiffs claim that Premier Bank conditioned the North Pointe purchase and development loan on Palowsky's and Smiarowski's agreement to the other transactions. They point out that the Bank benefitted from the other "swap" transactions because Dr. Joyner's troubled debt was reduced by $1 million, and additional security was pledged for his remaining debt.

The Bank disputes this characterization of the negotiations. The Bank claims that Palowsky was primarily responsible for negotiating the restructure plan. Although the Bank admits that it sought to protect its investments, it claims that its role in the negotiations was limited to accepting the proposals made by the parties. The Bank also claims that the parties pressured Mr. Hood to commit to the development loan, and that Mr. Hood did not inform Bank management of the commitment.

In March of 1988, Premier Bank notified the Gulf States Plaintiffs that it would not advance any additional funds on the North Pointe development loan. Bank management was, at that time, under the impression that the loan commitment was for $2.4 million. The Bank claims that as of March 1988, it had funded $2.4 million, but only 54 of the 175 subdivision lots had been developed. The Bank had the property appraised, and it was valued at $1 million less than the outstanding loan balance on the development loan. The Bank requested additional security or a cash payment to reduce the undercollateralized portion of the loan.

On March 21, 1988, the Plaintiffs filed suit against the Bank in Louisiana state court for breach of contract, seeking $195 million in damages and contesting liability on the amount advanced under the loan commitment. Premier Bank also filed suit in state court seeking a declaratory judgment as to which party breached the loan agreement.

The Plaintiffs claim that several acts by Premier Bank in the course of the state court litigation constitute additional violations of the Bank Holding Company Act. On August 3, 1988, the Bank deposited the unfunded portion of the development loan into the state court's registry pursuant to an *ex parte* order that placed certain requirements on advances of the funds. The Plaintiffs refused to comply with the requirements, and the state court later reversed the *ex parte* order. On October 2, 1989, Premier Bank offered to advance funds necessary to complete water and sewer connections to North Pointe if the Plaintiffs would consent to an agreed judgment in the amount of the new advances. The Plaintiffs refused the offer. They describe these actions by the Bank as extensions of credit on conditions that violate the anti-tying provisions of the Bank Holding Company Act.

The Plaintiffs also assert claims under the Sherman and Clayton Acts and the Louisiana Antitrust Statute based on the Bank's failure to fund the development loan and to perform other obligations necessary to complete the development of North Pointe, such as approving subdivision restrictions necessary to transfer clear title on the lots. They assert that the Bank and its officers acted in concert to prevent the development of North Pointe because it competed for lot sales with nearby subdivisions owned by officers and directors of the Bank.

Two of the Plaintiffs, Roy and Linda McCaskill, were not parties to the transactions between the Bank and the Gulf States

Plaintiffs. Once North Pointe was under development, the McCaskills purchased a lot in the subdivision and built a house. Their claim against the Bank is based on the Bank's failure or refusal to approve subdivision restrictions or to fund water and sewer hookup for the subdivision. The McCaskills claim that, as a result of the Bank's inaction, they lost the mortgage on their home and therefore lost the home and all of the money invested in its construction. In addition to the federal claims, the McCaskills assert a pendent claim at state law for intentional interference with contractual relations.

The district court granted summary judgment in favor of Defendant Premier Bank on all claims. The Plaintiffs appeal.

## Discussion

We review the district court's grant of summary judgment *de novo* to determine whether a disputed issue of material fact makes the district court's grant of summary judgment inappropriate.

1. *Bank Holding Company Act*

The Plaintiffs assert that Premier Bank violated the anti-tying provision of the Bank Holding Company Act on three separate occasions. The relevant provision of the Act provides as follows:

> A bank shall not in any manner extend credit ... on the
> condition or requirement that the customer provide some

> additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan....

12 U.S.C. § 1972(1)(C). The Plaintiffs claim that Premier Bank violated this provision in the first instance by conditioning the North Pointe purchase and development loan on Palowsky's and Smiarowski's agreement to the other transactions. We note at the outset that the only Plaintiffs with standing to assert this claim are Mr. Palowsky and Dr. Smiarowski. *See* 12 U.S.C. § 1975; *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442–43 (5th Cir.1986).

Plaintiffs' counsel, in brief and oral argument, focused a great deal of attention on allegations that Mr. Hood blackmailed Mr. Palowsky with information obtained in a private investigation of Mr. Palowsky's background. Mr. Hood allegedly coerced Mr. Palowsky to participate in the purchase and development loan under threats that Mr. Hood would expose the information and ruin Mr. Palowsky's reputation in the community. The district court found that these allegations were immaterial to the Plaintiff's claims under the Bank Holding Company Act. We agree. The alleged extortion does not in itself constitute a Bank Holding Company Act violation, nor does it establish any element of the Bank Holding Company Act claim based on the transactions surrounding the sale of the North Pointe tract.

The district court granted summary judgment on the Plaintiffs' claim based on those transactions because the Plaintiffs did not

establish that conditioning the development loan on the other transactions was unusual.[1]  In order to survive summary judgment, the Plaintiffs must present evidence sufficient to create a fact issue regarding whether the conditions placed on the loan were unusual in the banking industry.  *See Dibidale v. American Bank & Trust Co.,* 916 F.2d 300, 304 n. 2 (5th Cir.1990);  *Rae v. Union Bank,* 725 F.2d 478, 480 (9th Cir.1984).  Accepting as true the Plaintiffs' allegations that Premier Bank conditioned the North Pointe loan on the other transactions, we find as a matter of law that the restructuring arrangement entered into by the parties in this case does not constitute an unusual banking practice.

The Gulf States Plaintiffs sought to purchase the North Pointe property for $800,000, and requested Premier Bank to release a $1.3 million mortgage on the property, which was then in default.  Even if the Bank, rather than Palowsky or Smiarowski, demanded that the other transactions occur, the Bank acted within traditional banking practices in requiring the debtors on the North Pointe property loan, Joyner and Smiarowski, to restructure their other troubled

---

[1]The district court also stated that the Plaintiffs' claim failed because the Plaintiffs did not establish that Premier Bank had engaged in an anticompetitive practice.  Citing *Palermo v. First National Bank and Trust Co.,* 894 F.2d 363 (10th Cir.1990), the district court stated that anticompetitive practice is an essential element of a claim under the Bank Holding Company Act. Because our holding rests on another aspect of the Plaintiffs' claim, we do not address this portion of the district court's opinion.  We note, however, that the Fifth Circuit has consistently held that a showing of anticompetitiveness is not required to state a claim under the Bank Holding Company Act. *See, e.g., Amerifirst Properties, Inc. v. FDIC,* 880 F.2d 821, 826 (5th Cir.1989);  *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 443 (5th Cir.1986).

debts prior to granting them a release on the $1.3 million loan and foregoing satisfaction of the $500,000 deficiency on the debt. That restructure necessarily involved Mr. Palowsky, because he was a joint debtor with Smiarowsky and Joyner on other related loans.

Attempting to establish that the conditions on the North Pointe loan were unusual, the Plaintiffs emphasize the transfer of Palowsky's and Smirowski's interest in the Arkansas property, in which Premier Bank had no interest, to Nancy Joyner, who the Plaintiffs argue is an unrelated party. We disagree with the Plaintiffs' position because, given the state of affairs between Dr. and Mrs. Joyner at the time, Mrs. Joyner was necessarily involved in the transactions. Mrs. Joyner was entitled to a portion of the proceeds of the sale of Dr. Joyner's interests pursuant to the Joyners' marital settlement agreement. Mrs. Joyner was obviously not an unrelated party in these transactions; transferring the Arkansas property directly to her, rather than to Dr. Joyner, merely satisfied her rights related to the various properties transferred.

We also note that the testimony of Joyner, Palowsky, and Smiarowski consistently reflects that all three independently desired to separate their business interests. Palowsky stated in deposition that all of the parties felt that mutual values were exchanged in the swap; this position is also documented in a release signed by all parties, stating that "[a]ll appearers acknowledge that the consideration for all of these transactions

represent mutual considerations ..., it being acknowledged and declared by all parties that these mutual considerations and transactions are equal in value for the benefit of each respective party." This uncontested testimony supports our view that the Bank did not abuse its economic power over these borrowers. The Bank acted within the scope of traditional banking practices to legitimately protect its troubled investments. Because we find that the conditions placed on the North Pointe loan were not unusual, we affirm the district court's grant of summary judgment on this claim.

We similarly reject the Plaintiffs' claims based on Premier Bank's actions in the course of the state court litigation. The Plaintiff's first claim is based on Premier Bank's procurement of an *ex parte* order limiting the Plaintiffs' access to funds that Premier Bank deposited into the registry of the state court. The order allowed the Plaintiffs to withdraw funds upon certification that all funds previously advanced were used for development of the subdivision and that the funds to be withdrawn would be used for the same purpose. Premier Bank cannot be said to have violated the Bank Holding Company Act by successfully urging the state court to enter the order. Given that the Bank suspected misappropriation of funds by the Plaintiffs, its attempt to invoke the district court's protection does not constitute "the improper use of economic leverage that the [Bank Holding Company] Act seeks to prevent." *Amerifirst Properties, Inc. v. FDIC,* 880 F.2d 821, 824 (5th Cir.1989).

The Plaintiffs also claim that Premier Bank's offer to advance funds for water and sewer hookup on the condition that the Plaintiffs' consent to an agreed judgment for the amount of the advance violated the Bank Holding Company Act. This was, again, in the context of litigation in state court, during the course of which the Plaintiffs had disclaimed liability for the amount of the funds previously advanced under the loan commitment. The Bank's offer was an attempt to accommodate the Plaintiffs' development efforts, while protecting itself against the Plaintiffs' disclaimer of liability for the funds advanced. As such, this conduct was within the scope of traditional banking practices, and does not constitute a violation of the Bank Holding Company Act. *See FDIC v. Linn,* 671 F.Supp. 547, 561 (N.D.Ill.1987) (conditioning loan on waiver of defenses to guaranties found to be a traditional banking practice).

The Plaintiffs have failed to establish their claims under the Bank Holding Company Act. We therefore affirm the district court's summary judgment in favor of the Defendant Premier Bank on those claims.

2. *Sherman and Clayton Acts*

The Plaintiffs also assert claims under the Sherman and Clayton Acts. Although unclear, the Plaintiffs' claim under the Sherman Act appears to allege a Section 1 violation by claiming that Premier Bank and its officers and directors, who own

subdivision lots in the vicinity of North Pointe, conspired to eliminate competition in lots sales by Gulf States. Premier Bank disclaimed the existence of a conspiracy in three affidavits by officers of Premier Bank, and offered valid business reasons for the Bank's refusal to continue funding the North Pointe development loan. The Plaintiffs have not responded with any evidence, direct or indirect, tending to prove the existence of a conspiracy. For this reason, summary judgment on their Section 1 claim was appropriate. *See Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).

To the extent that the Plaintiffs assert other claims under the Sherman and Clayton Acts, they have failed to specify their contentions or identify the particular provisions of these statutes under which their claims arise. Because the Plaintiffs' have failed to satisfy the standard set forth in Rule 28(a)(4) of the Federal Rules of Appellate Procedure, we consider those claims waived. *See Weaver v. Puckett,* 896 F.2d 126, 128 (5th Cir.), *cert. denied,* --- U.S. ----, 111 S.Ct. 427, 112 L.Ed.2d 411 (1990).

3. *Louisiana State Law Claims*

The Plaintiffs' claim under the Louisiana antitrust statute fails for the same reason their federal antitrust claim fails. The Plaintiffs have not come forward with any evidence of a conspiracy to support their claim. *See* La.Rev.Stat.Ann. § 51:122 (West 1987).

The district court's grant of summary judgment was therefore appropriate.

The McCaskills, who contracted with Gulf States to purchase a lot in North Pointe, brought a Louisiana state law claim against Premier Bank for intentional interference with contractual relations. Louisiana recently recognized a limited exception to its general refusal to recognize a cause of action for intentional interference with contractual relations in *9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d 228 (La.1989). That exception is limited, however, and does not cover the type of conduct at issue here. We agree with the district court that the McCaskills' claim does not fit within the *9 to 5* exception and affirm the district court's summary judgment on this claim.

For all of the foregoing reasons, we AFFIRM the district court's grant of summary judgment on all claims. We, therefore, need not consider the Motion for Summary Affirmance recently filed by the Defendant in this case.