**DIBIDALE OF LOUISIANA, INC.,**
**Plaintiff–Appellant,**

v.

**AMERICAN BANK & TRUST COMPANY, NEW ORLEANS, et al., Defendants–Appellees.**

Nos. 89–3601, 90–3400.

United States Court of Appeals,
Fifth Circuit.

Nov. 6, 1990.

---

James F. Willeford, Gordon P. Serou, Jr., John H. Ryan, New Orleans, La., for plaintiff-appellant.

C. Berwick Duval, Jr., Sidney C. Sundbery, Houma, La., for First Nat. Bank of Houma.

Robert S. Rooth, Corinne Ann Morrison, Robert G. Coury, E. Howell Crosby, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for American Bank & Trust and Allen Frederic, Jr.

Donna D. Fraiche, Sandra A. Vujnovich, Fred J. Cassibry, Jack P. Brook, Brook, Morial, Cassibry, Fraiche & Pizza, New Orleans, La., for Whitmore.

Before POLITZ, JOLLY, and JONES, Circuit Judges.

POLITZ, Circuit Judge:

Dibidale of Louisiana, Inc. appeals an adverse summary judgment dismissing its complaint that American Bank & Trust and the First National Bank of Houma illegally tied its approval for a loan to its use of a contractor of American Bank's choosing, in violation of the Bank Holding Company Act (BHCA), 12 U.S.C. § 1971 *et seq.* Finding that the BHCA, unlike general antitrust statutes, does not include a coercion element, we vacate in part and remand.

### Background

In early 1987 Dibidale Securities Establishment (DSE) sought to acquire, through its subsidiary Dibidale, a partially complete townhouse and boathouse development in Louisiana held by the Federal Savings and Loan Insurance Corporation. Robert Wagner, a general contractor serving as FSLIC custodian for the development, informed Dibidale that it would cost an estimated $4,000,000 to complete the project. According to Dibidale agent Nicholas Popich and architect Leonard Spangenberg, Dibidale was prepared to award the contract to Wagner when it obtained the loan needed to acquire and complete the development.

Popich contacted Peter Butler, a director and attorney for American Bank, to initiate loan negotiations. What occurred in the course of those negotiations forms the core of the instant dispute. According to affidavits filed by Spangenberg and Popich, Butler informed them by telephone that American Bank wanted National Building and Contracting Co., headed by Ronnie J. Theriot, to be the general contractor or project manager for the development. Spangenberg and Popich traveled to New Orleans to discuss the loan and were introduced to Theriot by an American Bank agent. American Bank and First National were under common ownership at the time. In the course of the negotiations with Ameri-

can Bank Popich met with Butler, William Whitmore, CEO of both American Bank and First National, and Abel Caillouet and Robert Blanchard, officers of both banks.

American Bank agents, including Whitmore, allegedly advised Spangenberg and Popich on several occasions about Theriot's reliability and encouraged them to hire him for the project. According to Popich, Theriot's name was mentioned at every negotiation session and Whitmore made it clear that American Bank would feel "comfortable" in making the loan if Theriot were hired. In a later meeting Butler informed Popich that American Bank was very desirous that Theriot get the job. While conceding that no one from American Bank ever expressly stated that hiring Theriot was a condition of the loan, Popich asserts that this was apparent and implicit in the negotiations with the bank.

Popich and Spangenberg finally decided that Dibidale would hire Theriot; American Bank issued its loan commitment letter the day after it learned of this decision. Unbeknownst to Dibidale, First National purchased a participation in the loan. Section 6.03 of the loan agreement required Dibidale to certify that it had chosen National Building from among "numerous possible general contractors" and that Dibidale "was not coerced or forced by [American Bank] in any manner" to do so.

Dibidale alleges that during the negotiations American Bank and Whitmore withheld material facts about Theriot and National Building's financial condition. As CEO of First National Whitmore was aware that Theriot owed that bank over $3,000,000, which he could not pay. Whitmore also was aware that during the course of negotiations with Dibidale, Theriot and National Building's debt with First National had been reorganized, with National Building assigning all of its accounts receivable to First National.

Almost a year after he was hired Theriot informed Dibidale that he could not complete the project for $4,000,000 as per their contract, but would require an additional $1,400,000. Dibidale borrowed this sum from American Bank. When Theriot advised Dibidale, one month later, that additional funds again would be required, Dibidale dismissed him and his company. According to Dibidale, some $2,000,000 in construction liens currently encumber the project, despite Theriot's having been paid $250,000 more than the $4,873,766 contract price.

American Bank and First National paint a very different picture. They contend that Dibidale has fabricated its allegations in a blatant attempt to avoid the consequences of its subsequent default on the American Bank loans.

Dibidale filed suit against American Bank, First National, Whitmore, Caillouet, Frederic, National Building, and Theriot, claiming violations of the anti-tying provisions of the BHCA, 12 U.S.C. § 1972, along with pendent state claims. Holding that the proscriptions of section 1972 apply only to banks, the district court dismissed Dibidale's federal claims against Whitmore, Caillouet, Frederic, and Theriot as individuals, but retained pendent jurisdiction over the state claims. DSE filed a similar claim against American Bank, Whitmore, Caillouet, Frederic, and First National. American Bank filed a separate suit in state court against Popich as personal guarantor of the loan. Popich removed the case to federal court. The district court consolidated the three cases in accordance with Local Rule 1.051E.[1]

American Bank, which initially had filed a motion to dismiss Dibidale's federal anti-tying claims, was granted leave to convert that motion into one for summary judgment. First National joined that motion. Analogizing to the Sherman Antitrust Act, which requires a showing of coercion under similar anti-tying provisions, the district

**1.** Local Rule 1.051E of the Eastern District of Louisiana provides:

> In order to promote judicial economy and conserve judicial resources, and to avoid the potential for forum shopping and conflicting

> Court rulings, all [collateral proceedings and refiled cases] shall be transferred to the section to which the matter having the lowest docket number has been allotted....

court concluded that Dibidale's allegations, even if true, failed to prove that American Bank had forced Dibidale to choose Theriot as its contractor. The district court thus dismissed the claims of both Dibidale and DSE based on section 1972 and further dismissed all of Dibidale's remaining state law claims, including those against the individual defendants.

Dibidale filed a motion for reconsideration. While that motion was pending the district court entered its final judgment dismissing Dibidale's claims, but did not certify the judgment pursuant to Fed.R. Civ.P. 54(b). Dibidale filed a notice of appeal from this judgment, after which the district court entered its order denying Dibidale's motion for reconsideration. Dibidale, however, did not file a second notice of appeal. Subsequent to oral argument the district court issued an appropriate Rule 54(b) judgment. Dibidale timely appealed that judgment which is also now before us.

## Analysis

### 1. Jurisdictional threshold.

■ Subsequent to the filing of briefs on the merits of this case we requested supplemental letter briefing on appellate jurisdiction. Specifically, we inquired whether certification of the judgment from which Dibidale had appealed was required under Fed.R.Civ.P. 54(b) and, if certification was not required or was otherwise obtained, whether Dibidale's motion for reconsideration rendered its earlier notice of appeal ineffective under F.R.A.P. 4(a)(4). As noted, the district court's subsequent issuance of a certified judgment pursuant to Rule 54(b), and Dibidale's subsequent timely appeal have rendered the first portion of this issue moot.

The appellees contend nonetheless that the Rule 54(b) certification must apply retroactively to the district court's original judgment, thus rendering Dibidale's earlier notice of appeal premature and its most recent notice of appeal untimely. We are not persuaded. Until the issuance of the qualifying Rule 54(b) judgment, no final judgment existed from which Dibidale could take an appeal. Accordingly, Dibidale's notice of appeal from the district court's post-argument judgment properly has invoked our jurisdiction.

### 2. Anti-tying claims—the proper legal standard under section 1972.

■ Section 1972(1) contains five subsections, each prohibiting a slightly different form of tying arrangement. In both its brief on appeal and at oral argument Dibidale has professed its reliance upon section 1972(1)(D), which provides that

A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company....

12 U.S.C. § 1972(1)(D). Dibidale alleges that by making the hiring of Theriot a condition or requirement for its loan, American Bank required Dibidale to provide a service to its affiliate First National, which held all of Theriot's accounts receivable.[2]

■ Dibidale contends that the district court erred in requiring it to demonstrate that it was forced to hire Theriot in order to prevail on its claim. While conceding that it is appropriate as a general rule to analogize to the general antitrust statutes in interpreting section 1972, *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54 (5th Cir. 1978), Dibidale urges caution in light of the absence from that section of the market

---

**2.** *Dibidale's reliance on section 1972(1)(D) renders irrelevant the banks' claims that it failed to present evidence of an unusual banking practice that falls within the purview of section 1972. The unusual banking practice element is a requirement only of complaints lodged under section 1972(1)(C), in which a bank imposes the* condition or requirement "that the customer provide some additional credit, property, or service to such bank [the bank providing the loan], other than those related to and usually provided in connection with a loan, discount, deposit, or trust service...."

power and anti-competitiveness elements required in more generalized antitrust claims. The "condition or requirement" language of section 1972 does not indicate whether a plaintiff has to prove that it was coerced—*i.e.*, forced—to accept a tying arrangement in connection with a loan, or whether merely proving the existence of the condition or requirement is sufficient to state a claim. Where the statute's plain language provides no clear answer we may look to legislative history for guidance. 2A Singer, *Sutherland Statutory Construction* § 48.06 (1984).

Each of the general antitrust statutes contains a provision that prohibits certain conditional transactions, or tying arrangements, in which the seller of one product (the tying product) conditions the sale of that product on the consumer's purchase or provision of another (the tied product). 15 U.S.C. § 1 (Sherman Act section 1); 15 U.S.C. § 14 (Clayton Act section 3); 15 U.S.C. § 45 (Federal Trade Commission Act section 5). Although the scope of these provisions encompasses the banking industry as well as commerce in general, their applicability in the banking context is problematic. *See* 9 E. Kintner and J. Bauer, *Federal Antitrust Law*, § 68.6 at 135–136. First, Clayton Act section 3 regulates only the sale or lease of goods, not services. Second, recent case law imposing stricter evidentiary burdens on Sherman and Clayton Act plaintiffs, *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *United States Steel Corp. v. Fortner Enterprises, Inc. (Fortner II)*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), renders successful tying claims under these statutes difficult to attain. Third, the unique nature of the banking industry renders it more important to prohibit conditional transactions in that context than in other less sensitive sectors of the economy. Kintner & Bauer, § 68.6 at 136.

 Congress enacted the anti-tying provisions of the BHCA "to provide specific statutory assurance that the use of the economic power of a bank will not lead to a lessening of competition or unfair competitive practices." S.Rep. No. 1084, 91st Cong., 2d Sess. 16, *reprinted in* 1970 U.S. Code Cong. & Admin.News 5519, 5535. The economic power of the banking industry stems from the aggregate control of banks over credit.[3] In light of this unique economic role that banks play, Congress perceived conditional transactions involving credit as inherently anti-competitive, operating to the detriment of banking and nonbanking competitors alike; thus the anti-tying provisions were intended to regulate conditional transactions in the extension of credit by banks more stringently than had the Supreme Court under the general antitrust statutes. S.Rep. No. 1084, 1970 U.S. Code Cong. & Admin.News at 5558 (Letter of Assistant Attorney General Richard McLaren). *See Fortner Enterprises, Inc. v. United States Steel Corp. (Fortner I)*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (stopping short of declaring tie-ins involving credit to be illegal *per se*).

 Central to this more stringent regulation of the banking industry was Congress's decision to exclude from the bank anti-tying provisions the market share and anti-competitiveness requirements which were the cornerstone of tying claims under the general antitrust statutes. To establish an illegal tying arrangement in violation of section 1 of the Sherman Act a plaintiff must establish: (1) that the defendant possesses market power over the tying product sufficient to force (*i.e.* coerce) the consumer into purchasing a tied product or engaging in a reciprocal deal with the seller; and (2) that the alleged arrangement forecloses "a substantial volume of commerce." *Jefferson Parish Hosp.*, 466 U.S. at 13–16, 104 S.Ct. at 1558–60. In contrast, a plaintiff claiming an unlawful tie-in or reciprocal dealing requirement under section 1972 may recover without dem-

---

**3.** According to Senator Edward Brooke, the premise underlying the bank anti-tying provision was "'a disturbing trend in the past year toward erosion of the traditional separation of powers between the suppliers of money—the banks—and the users of money—commerce and industry.'" 1970 U.S.Code Cong. & Admin. News at 5557. (Supplementary Views of Senator Brooke (quoting statement of then-President Richard Nixon).)

.

onstrating the tying bank's market power or the anti-competitive effect of the alleged arrangement. *See Bruce v. First Federal Sav. & Loan Ass'n,* 837 F.2d 712 (5th Cir. 1988); *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440 (5th Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Parsons Steel, Inc. v. First Alabama Bank, N.A.,* 679 F.2d 242 (11th Cir.1982); *Costner v. Blount Nat'l Bank,* 578 F.2d 1192 (6th Cir.1978); *but see McGee v. First Fed'l Sav. & Loan Ass'n,* 761 F.2d 647 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 273, 88 L.Ed.2d 234 (1985) (applying the Sherman Act *Jefferson Parish* standard).

The fact that Congress, in enacting the anti-tying provisions of the BHCA, sought to regulate a specific industry out of a recognition of that industry's aggregate economic power and unique economic role, undergirds our interpretation of the "condition or requirement" language central to Dibidale's appeal. To restrict the scope of those words to tying arrangements in which a seller is literally forced to purchase or provide a tied product or service in order to obtain credit would vitiate that section's intended role for, as Congress recognized, a tying arrangement may squelch competition whether coercive or not:

> [T]ie-ins may result from actual coercion by a seller or from a customer's realization that he stands a better chance of securing a scarce and important commodity (such as credit) by "volunteering" to accept [or provide] other products or services rather than seeking them in the competitive market place. *In either case, competition is adversely affected, as customers no longer purchase a product or service on its own economic merit.*
>
> Reciprocity, which involves the induced provision of products and services by the customer rather than his acceptance of other products and services, may also come about in these involuntary or "voluntary" manners.

Conf.Rep. No. 1747, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5561, 5569 (emphasis added).

Nonetheless, American Bank and First National contend that Congress deliberately excluded these "voluntary" tying arrangements from the scope of section 1972 when it adopted the so-called Bennett amendment. As originally drafted, section 1972 prohibited banks from extending credit on the "condition, agreement, or understanding" that the customer would accept or provide some other product or service. The Bennett amendment replaced these words with the phrase "condition or requirement." As the comments of Senator Bennett make clear, however, the purpose of the amendment was to exclude from the scope of section 1972 the extreme case in which a plaintiff alleges nothing more than the mere simultaneity of transactions between bank and borrower:

> The elimination of the words "condition or understanding," and the substitution of the word "requirement," are intended to eliminate possible inferences and implications of tie-ins and exclusive dealing arrangements based on a bank's performance of two or more services for a particular customer, or the bank's providing a service to the customer and receiving a deposit or other service from the customer at the same time. The bill as amended would require that a condition or requirement imposed by the bank must be demonstrated in order to prove that a violation of the section has occurred.

116 Cong.Rec. 32124, 32125.

Unlike the general marketplace where the power to coerce a consumer to accept a tying arrangement is directly related to the market power of the proposed coercer, in the banking industry the power to coerce is inherent in the banking relationship itself, regardless of an individual bank's market power. The transaction costs associated with establishing or severing a banking connection, as well as the loss of confidential financial data that can result from a banking change, dissuade frequent changes. *See* Leonard, *Unfair Competition Under Section 106 of the Bank Holding Company Act,* 94 Banking L.J. 773, 787 (1977). This environment, which provides a suitable climate for the

imposition of "voluntary" tying arrangements, is a far cry from the tying paradigm of the general antitrust statutes with its emphasis on market power and coercion. The district court erred in overlaying this coercion requirement on its analysis of Dibidale's allegations under section 1972. Dibidale need only have alleged, as it did, that hiring Theriot was a "condition or requirement" of its obtaining the loan from American Bank.

3. Genuine issue of material fact.

 Applying the correct standard under section 1972(1) to the summary judgment evidence presented, it appears that Dibidale has adequately presented a genuine issue of material fact as to whether hiring Theriot and National Building was a condition or requirement of the American Bank loan.[4] The banks contend that Popich's deposition testimony unequivocally states that Wilmore Whitmore, CEO of both American Bank and First National, never expressly imposed hiring Theriot as a condition or requirement of the loan. They urge this court to ignore Popich's subsequent affidavit outlining the circumstances under which this requirement for obtaining the loan allegedly was communicated to Dibidale.

The deposition testimony by Popich, on which American Bank and First National heavily rely, states:

For the record, though, [Wilmore Whitmore] never once told me to give [Theriot] the work in spite of anything. You know, I am familiar with this complaint and all, so we've talked about it. So you have to understand what I'm saying. I cannot say that Mr. Whitmore said on behalf of the Bank you give Ronnie the work. But we're all business people. He wanted Ronnie to have the work. He was comfortable with that; I was com-

fortable with that. The Bank, as far as I was concerned, was supportive of Ronnie; good enough for the Bank, he was good enough for me.

Subsequently, in response to the banks' motion for summary judgment Dibidale submitted an affidavit in which Popich stated in part:

Leonard Spangenberg and I believed that Wagner was better qualified for the job primarily due to his familiarity with the project, but because Dibidale wanted the loan from the American Bank, which was strongly urging the use of Theriot throughout the loan negotiations and since we had no adverse information about Theriot, Dibidale did not protest the selection of Theriot as the project manager/general contractor. We mistakenly believed that if Theriot was good enough for the American Bank, he was certainly good enough for our project.

 In reviewing a motion for summary judgment the court must consider all of the evidence before it, including affidavits that conflict with deposition testimony. A genuine issue of material fact may be raised by such an affidavit "even if it conflicts with earlier testimony in the party's deposition." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 893 (5th Cir.1980) (citing 6 *Moore's Federal Practice* ¶ 56–15[4] at 56–522 (2d Ed.)). Nor, for that matter, is Popich's affidavit necessarily inconsistent with his deposition testimony. Read in the light most favorable to Dibidale as the non-movant, both documents assert that American Bank succeeded in making clear its intentions without flagrantly violating the law.[5] To the extent they exist, discrepancies in those averments present credibility issues properly put to the trier-of-fact. *Kennett–Murray,* 622 F.2d at 894. Credibility assessments are not fit grist for the

---

4. The banks' contention that the parol evidence rule precludes Dibidale from raising these allegations in light of language in the loan agreement stating that Dibidale hired Theriot of its own free will is without merit. The terms of the loan agreement notwithstanding, the relevant issue is whether Dibidale has provided sufficient evidence that its hiring of Theriot was a condition or requirement of the loan so as to

survive the banks' motion for summary judgment.

5. Dibidale further asserts that Popich's deposition testimony must be read in light of the fact that immediately after Popich made the quoted statement the deposition was recessed for a time to pursue settlement negotiations.

**308**

summary judgment mill. Dibidale's evidence, both direct and circumstantial, including the fact that American Bank approved the loan one day after Dibidale hired Theriot, renders summary judgment inappropriate herein. We do not now resolve this genuine issue of material fact; that remains for the trier-of-fact.

4. Retained jurisdiction over the individual defendants.

 Finally, Dibidale contends that the district court erred in dismissing Whitmore, Caillouet, Frederic, Theriot, and National Building on the grounds that the anti-tying provisions of the BHCA impose liability on banks, rather than individuals. As Dibidale concedes, every court considering the issue has accorded the provisions this interpretation. *See Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 898 n. 23 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Rae v. Union Bank*, 725 F.2d 478, 480 (9th Cir.1984); *Blue Line Coal Co. v. Equibank*, 683 F.Supp. 493, 495 (E.D.Pa.1988); *Nesglo, Inc. v. Chase Manhattan Bank, N.A.*, 506 F.Supp. 254, 265 (D.P.R.1980). Inasmuch as the BHCA defines banks as institutions, 12 U.S.C. § 1841(c), and Congress specifically elected to regulate individual conduct by way of civil administrative penalties elsewhere in section 1972, 12 U.S.C. § 1972(2)(F)(i), we reach the same conclusion. In this particular we perceive no error in the district court's judgment.

The district court's grant of summary judgment is VACATED IN PART and the matter is REMANDED for further proceedings not inconsistent herewith.

EDITH H. JONES, Circuit Judge, dissenting:

With all due respect to the conscientious efforts of the majority, I must disagree with their reading of the bank anti-tying provision, § 1972(1) of the Bank Holding Company Act Amendments of 1970. The statute expressly distinguishes between a bank's suggesting that a customer use a particular service, and its forcing him to do so. That distinction settles this case, because there is no evidence that American Bank would have refused to lend Dibidale money if it did not hire Theriot as general contractor.

*A. The Bank Anti–Tying Provision*

Section 1972(1), denominated the bank anti-tying provision of the Bank Holding Company Act, contains five parallel proscriptions. Subsection D, applicable here, states:

> A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
>
> (D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company....

In my view, the plain meaning of the statute, its similarity to the anti-tying provisions of the federal antitrust laws, and the history of its drafting all clearly indicate that a tying arrangement must be forced upon an unwilling party to constitute a violation.

In interpreting any statute, a court begins with the language of the Act itself. *Mallard v. United States Dist. Court for Southern Dist. of Iowa*, 490 U.S. 296, 109 S.Ct. 1814, 1818, 104 L.Ed.2d 318 (1989). Section 1972(1) proscribes defined tying practices that are a "condition or requirement" for a bank's extension of credit.[1] The terms "condition" and "requirement" are not specifically defined in the statute. In such a case, courts recur to the ordinary meaning of these terms, for we assume that Congress's purpose was expressed by the ordinary meaning of the statutory language. *See United States v. Locke*, 471

---

1. The precise statutory language encompasses tying, exclusive dealing and reciprocity arrangements related to the extension of credit, leasing or selling of property, furnishing of services, or fixing or varying the consideration for these activities. My discussion applies to all of the act's coverage, but I refer to extension of credit throughout this discussion as a shorthand reference to the whole.

U.S. 84, 95–96, 105 S.Ct. 1785, 1792–93, 85 L.Ed.2d 64 (1985). The dictionary defines "condition" and "requirement" synonymously as "something essential to the appearance or occurrence of something else." *Webster's Ninth New Collegiate Dictionary* (1985). Thus, a tying arrangement must by ordinary definition be essential to the loan before it is condemned by § 1972(1). That a "condition or requirement" must be essential to the loan negates the majority's hypothesis that mere voluntary action by a bank customer, undertaken in the hope that it will improve his chance to secure a loan, violates the act.[2]

The majority do not disagree that the plain meaning of "condition or requirement" is that a bank must insist upon the tying transaction with its customer. Rather, they concede the plain meaning but argue that "to restrict the scope of those words to tying arrangements in which a seller is literally forced to purchase or provide a tied product or service in order to obtain credit would vitiate [§ 1972's] intended role ..." Thus, the majority go beyond the plain meaning of the language in the statute to express its "spirit." I shall not pause to engage in the debate over the proper role of judges in matters of statutory construction, but I cannot agree that a statute as clear as this one needs, in effect, a judicial amendment to express its purpose.

The majority's invocation of the "spirit" of the bank anti-tying law is conjured from flawed legislative history. It is well-recognized that § 1972(1) derives from the Sherman and Clayton Acts' anti-tying measures and should be interpreted in that light. In *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54, 58–59 (5th Cir.1978), this Court held that reference to antitrust statutes when construing § 1972 is "most pertinent in view of the substantial similarity of the Acts." *See also Campbell v. Wells Fargo Bank*, 781 F.2d 440, 443 (5th Cir.1986); *Exchange Nat'l Bank of Chicago v. Daniels*, 768 F.2d 140, 143 (7th Cir.1985); *Parsons Steel, Inc. v. First Alabama Bank of Montgomery*, 679 F.2d 242, 245 (11th Cir. 1982). Under the federal antitrust statutes, a tying arrangement is illegal when there exists: (1) two separate products; (2) sufficient market power in the tying market to *coerce* purchases of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effect in the tied market. *Crossland v. Canteen Corp.*, 711 F.2d 714, 722 (5th Cir.1983). Pursuing this analogy correctly yields two results. First, as the majority state, Congress broadened § 1972(1) beyond the Sherman and Clayton Acts by dispensing with the need for proof of the economic power of the bank (*i.e.*, the seller) and the anticompetitive effects of a tying arrangement in the tied market. Congress also eliminated the need to prove the involvement of a not insubstantial amount of interstate commerce in the tied product.

Equally important, however, Congress declined to alter the rule that a tying arrangement violating federal anti-trust laws must be imposed upon a buyer as a requirement of a deal with the seller of the "tying" product. This rule has found repeated expression in our Court:

> Actual coercion is an indispensable element of a tie-in charge. A manufacturer may use strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce a party to buy incidental products and services. An anti-trust violation occurs only if [the manufacturer] goes beyond persuasion and coerces or forces its customers to buy the specified product in order to obtain the tying product.

*Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. Unit

---

**2.** The plain meaning of § 1972(1) was clear enough to the Third Circuit which, in ruling against a bank customer's claim under § 1972(1)(C), held: "There is no evidence that Tose's ouster in favor of Barness was made a 'condition or requirement' of a loan to the Eagles or to Tose. Appellants allege only that Tose's ouster in favor of Barness was the hidden agenda behind the conspiracy charged in count one. This does not satisfy the 'condition or requirement' element of § 1972(1)(C)." *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 897 (3d Cir.1981), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

A), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981) (quoting *Ogden Food Service Group v. Mitchell,* 614 F.2d 1001, 1002 (5th Cir.1980).[3]

The harmony between the anti-trust laws' coercion element and the "condition or requirement" language of § 1972(1) is apparent. That this harmony was intentional is confirmed by the drafting history of § 1972(1). Congress rejected a proscription of bank tying activities founded on a "condition, agreement or understanding" between the parties in favor of the Bennett Amendment, which enacted the more demanding standard of a bank's imposing a "condition or requirement." These connections between the anti-trust laws, the drafting history, and the clear language ultimately selected by Congress cannot be meaningless. On the contrary, they represent the kind of legislative history that is particularly reliable, and they point only one way: toward the mandate that express, not "understood," tying provisions violate § 1972(1).

The majority misread this legislative background. Their opinion disregards the antitrust coercion element by sleight of hand. According to the majority, because Congress deliberately forebore to incorporate the market power and substantial effect on commerce elements of antitrust tying law into the bank anti-tying amendments, it also decided, albeit inferentially, to forebear incorporating the element of coercion. A more logical interpretation of Congressional intent would draw the opposite conclusion. We assume that Congress was familiar with all three elements of the antitrust tying law. Because only two of those elements are specifically absent from the analogous bank statute, Congress must have meant to retain the third element. It also appears that the majority have confused proof of market power—which has been required under the antitrust laws because it confers the ability on a manufac-

turer to tie sales of more than one product—with the element of coercion—which signifies the manufacturer's choice or determination actually to engage in tying. As the Supreme Court stated:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hosp. Dist. v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984) (citing *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). It is not at all illogical that Congress decided to assume the market power of each individual bank, while still requiring proof that a bank chose to exercise that power by conditioning or requiring tying arrangements with customers.

The majority also rely on a policy determination, supported by one isolated comment from the Congressional Conference Report on § 1972(1), to conclude that a banking relationship is "inherently coercive," from which it allegedly follows that coercion must be *assumed* whenever a tied transaction exists. Because this determination is contrary to the plain meaning of the "condition or requirement" statutory language, it is for that reason alone suspect. But the majority's policy determination also requires reading the Bennett Amendment—which tightened the definition of a prohibited tying arrangement from one founded on a "condition, agreement or understanding" to one founded on a "condition or requirement"—in an unduly restrictive manner.[4]

---

**3.** *See also Jefferson Parish Hosp. Dist. v. Hyde,* 466 U.S. 2, 13–16, 104 S.Ct. 1551, 1558–60, 80 L.Ed.2d 2 (1984); *Bruce v. First Federal Sav. and Loan Assoc.,* 837 F.2d 712, 715–16 (5th Cir.1988); *Tic–X–Press, Inc. v. Omni Promotions Co.,* 815 F.2d 1407, 1415 (11th Cir.1987).

**4.** The majority opinion states that Senator Bennett's purpose was to exclude merely simultaneous banking transactions from the scope of § 1972(1). Their quotation from his statement in the Congressional Record goes on to say that, "The bill as amended would require that a con-

Finally, the majority's policy argument that "the unique nature of the banking industry renders it more important to prohibit conditional transactions in that context than in other less sensitive sectors of the economy" is hard to justify except as an expression of judicial preference for a predetermined result. Congress presumably enacted § 1972(1) in response to the Supreme Court's *Fortner I* decision,[5] which suggested that credit, unlike other goods or services in the economy, might not always be a tying product. That Congress then chose to bring credit within the purview of tying law does not, however, suggest precisely how it sought to accomplish that goal. An understanding of Congress's motivation, in other words, does not substitute for employing the traditional tools of legal reasoning on the language of the statute. *See Begier v. Internal Revenue Serv.*, — U.S. —, 110 S.Ct. 2258, 2269, 110 L.Ed.2d 46 (1990) (Scalia, J., concurring). Such an understanding certainly does not authorize courts to "strengthen" or "improve" the statute to better achieve Congressional goals. We assume Congress was capable of articulating its policy, complete with such limits as the give and take of lawmaking required. In this instance, Congress chose to eliminate the requirements of market power, substantiality of commerce in the tied product, and anticompetitive effects in the tied market from existing antitrust tying law. Neither the language of § 1972 nor its drafting history indicates, however, a separate determination to eliminate the requirement that a tying arrangement be literally required of a bank customer. The majority's interpretation of § 1972(1), in the guise of enforcing Congressional policy, actually has to ignore the plain meaning of a "condition or requirement."

Accordingly, I respectfully disagree with the majority and would hold that § 1972(1)(D) is violated only if a bank imposes as a condition or requirement of lending that its customer perform other services for the bank or its affiliated company.

### B. *Summary Judgment Proof*

Whether § 1972(1)(D) is construed by the majority's standard or by its precise language, summary judgment was properly rendered for the bank. In my view, the language of § 1972(1)(D) speaks to situations in which a bank has made some attempt to force the customer into providing a service to a bank affiliate that he would not otherwise provide absent a threat to deny him credit. The evidence in this case does not rise to that level. The strongest evidence Dibidale could muster with respect to proving a "requirement" or "condition" that Dibidale hire Theriot came from Nicholas Popich. In his affidavit, Popich stated that:

> "because Dibidale wanted the loan from the American Bank, which was strongly urging the use of Theriot throughout the loan negotiations and since we had no adverse information about Theriot, Dibidale did not protest the selection of Theriot as the project manager/general contractor."

Popich's affidavit is revealing. The bank may have informed Dibidale of the contractor that it preferred, or it may have even encouraged or persuaded Dibidale to accept the contractor. What is completely absent both from Popich's affidavit and from the record in general, is any evidence that the bank ever told Dibidale, either expressly or impliedly, that it must use Theriot or face a refusal to make the loan.

On the contrary, in several instances Dibidale admitted that no such condition or requirement of the loan was ever expressed. Popich's deposition states: "for the record, though, [the bank] never once told me to give [Theriot] the work in spite of anything." Even the loan agreement

---

dition or requirement *imposed by the bank must be demonstrated* in order to prove that a violation has occurred." Conf.Rep. (emphasis added) At the very least, this language does not comment on the degree of coercion required beyond non-simultaneity. More likely, it emphasizes that the bank must *impose* a violative tying arrangement on the customer.

**5.** *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

indicates that Dibidale was not required to employ Theriot as contractor:

> Borrower hereby confirms and certifies that the selection of ... [Theriot] was his choice from among numerous possible general contractors and that he was not coerced or forced by Lender in any manner to choose [Theriot]....

Not only is this provision unambiguous and unequivocal, it was, according to deposition testimony, inserted in the loan agreements at the insistence of Dibidale's attorneys. Unlike the majority, I see no reason for discounting the significance of this provision (at 307 n. 4), especially when it is in perfect rapport with Dibidale's own affidavit and deposition testimony.

Even if I agreed with the majority's expansive reading of § 1972(1)(D), I still could not conclude that the district court improperly granted summary judgment in this case. Dibidale's evidence no more establishes an "implied condition" than it does an express one. Dibidale offered no testimony that it accepted Theriot as contractor because it feared the bank would not otherwise extend credit. Dibidale never suggested that it hired Theriot because it believed—despite what the bank may or may not have said—that it had to provide this "incidental" service to the bank in order to obtain a loan. In his deposition, Mr. Popich stated that he was perfectly comfortable with Theriot's being the general contractor. As he put it, "[t]he Bank, as far as I was concerned was supportive of Ronnie [Theriot]; [if he was] good enough for the Bank, he was good enough for me."

The majority caution that "credibility assessments are not fit grist for the summary judgment mill." Yet, unless it is a court's function to make the non-movant's case for him—by doubting the trustworthiness of his own statements—I fail to see what credibility assessments were necessary in this case. Popich's affidavit opposing summary judgment, the only evidence on Dibidale's behalf, is more self-serving than his earlier, more candid deposition testimony. But as has been seen, none of Popich's statements under oath raise a genuine fact issue that the bank expressly or impliedly conditioned or required that its loan to Dibidale be accompanied by the hiring of Theriot.

Whether it considered Dibidale's deposition testimony, affidavit testimony, or all the testimony combined, the district court could not have discovered a genuine factual issue relating to any condition or requirement, either express or implied. In my opinion, summary judgment was not just appropriate in this case, it was mandated. Accordingly, I respectfully dissent.

