97 F.3d 337
 96 Cal. Daily Op. Serv. 7190, 96 Daily Journal
D.A.R. 11,794
S & N EQUIPMENT COMPANY, an Arizona general partnership,
Plaintiff-Appellant,
v.
CASA GRANDE COTTON FINANCE CO., an Arizona corporation;
Chickasha Cotton Oil Company, a Delaware
corporation, Defendants-Appellees.
 No. 94-16303.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 6, 1995.
Decided Sept. 26, 1996.
 
 John A. Baade (on the briefs and argued) and Sally M. Darcy (on the briefs), Raven, Kirschner & Norell, Tucson, Arizona, for plaintiff-appellant.
 Mark S. Sifferman, Norling, Perry, Pierson & Kolsrud, Phoenix, Arizona, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; Roger G. Strand, District Judge, Presiding.
 Before: GOODWIN and REINHARDT, Circuit Judges, and KING, District Judge.*
 OPINION
 REINHARDT, Circuit Judge:
 
 
 1
 Plaintiff, S & N Equipment Company (S & N), a general partnership, appeals the district court's denial of its motion for summary judgment and the grant of summary judgment in favor of the defendants, Casa Grande Cotton Finance Company (Casa Grande) and Chickasha Cotton Oil Company (Chickasha). S & N alleges that Casa Grande violated state and federal banking law by conditioning financing on the purchase of ginning services from gins owned by Chickasha. The district court concluded that the transactions were not illegal under Arizona's usury law or the Bank Holding Company Act. We affirm in part and reverse and remand in part for further proceedings.
 
 
 2
 * From 1988 to 1991, Casa Grande, a wholly-owned subsidiary of Chickasha, made loans to S & N for cotton crop production.[1] The loans totalled more than $3 million, and the interest on the loans exceeded ten percent from January 1, 1988 to May 15, 1991.[2] Casa Grande expressly conditioned the loans on S & N's processing its cotton at cotton gins owned by Chickasha.[3] Casa Grande required its borrowers to pledge their crops as collateral, maintaining that the ginning requirement ensures proper monitoring of the crops.[4]
 
 
 3
 S & N claims that it lost approximately $200,000 as a result of the ginning agreement. It calculates this figure by comparing the net cost of ginning at Chickasha with the net cost of ginning at competing cooperative gins. The charges for the actual ginning services performed by Chickasha and the cooperatives were roughly comparable during the period in question. S & N attributes the difference in the net cost to the manner in which Chickasha structures the transaction, in particular, the price it pays for cotton seed. Chickasha buys cotton seed directly from its ginning customers.[5] It sets a posted price at which it buys the seed, but allows its customers to sell to third parties instead (subject to Chickasha's right of first refusal), if they can obtain more than the posted price. The cooperative gins, by contrast, do not buy cotton seed but perform the service of selling it for their customers. Due to the volume of seed the cooperatives handle, they are able to market the seed more effectively than can the individual growers who gin at Chickasha. As a result, the cooperatives obtain a higher price for the seed than either Chickasha's posted price or the price that Chickasha's customers obtain when they make third-party sales.
 
 
 4
 On some occasions, S & N sold its seed to third parties, but generally the partnership sold it to Chickasha at the posted price, under the ginning agreement. From 1989 to 1991, Chickasha paid its customers $112, $130, and $80 per ton of cotton seed, respectively, while the cooperatives sold it for (and effectively paid their customers) $138, $138, and $120, respectively. The price paid by Chickasha, however, was consistent with the market rate for cotton seed during those years; those rates were $111, $136, and $82, respectively.
 
 
 5
 Casa Grande, in addition to making loans, accepted funds from its customers, which it placed in "credit accounts."[6] It deposited the funds in its general operating account--into which it placed its revenues and from which it paid its operating expenses and funded loans--and paid interest at Bank of America's prime rate. Casa Grande did not have any written agreement with its customers concerning when deposits were payable; however, its policy was to return funds to customers "as they needed it."[7] Casa Grande did not provide customers with checks or similar instruments that could be made payable to a third party as cash. Customers nonetheless could direct Casa Grande through "disbursement forms" to pay funds to third parties. When requested, Casa Grande wrote a check on its general operating account.
 
 II
 
 6
 S & N contends that Casa Grande violated Arizona's usury statute by conditioning its loans on an agreement to gin at Chickasha. S & N argues that the net cost of ginning there was unreasonable, as compared to the net cost at the cooperative gins, and that the difference constituted interest that Casa Grande exacted in addition to that specified in the contract. While we assume for purposes of this decision that the transactions would be usurious if the ginning agreements were not fair and reasonable, we conclude that S & N has not raised a genuine issue of material fact as to the usury issue.
 
 
 7
 Arizona Revised Statute § 44-1202 provides, in relevant part, that no person shall "directly or indirectly take or receive in money, goods ..., or in any other way, any greater sum or any greater value for the loan ... than the maximum permitted by law." Interest on a loan is set at the rate of ten percent per year "unless a different rate is contracted for in writing, in which event any rate of interest may be agreed to." Ariz.Rev.Stat.Ann. § 44-1201A. The district court concluded that these provisions, taken together, establish that a lender who contracts in writing for a rate of interest exceeding ten percent may not receive any interest in addition to that which he has contracted for in writing, because that interest rate is the maximum permitted by law. Again, we assume, without deciding the issue, that this a proper interpretation of Arizona law.[8]
 
 
 8
 Because the parties agreed to specific interest rates that exceeded ten percent, we must determine whether Casa Grande directly or indirectly received any additional interest through the ginning agreement.[9] There are two approaches that we may take in addressing this issue. We could look to cases involving agreements collateral to a loan, in which case we would determine whether the ginning agreement was supported by adequate and commensurate consideration, or we could look to cases involving services related to a loan, in which case we would determine whether the ginning agreement was reasonable. Because the defendants prevail whichever approach we apply, we need not decide which is applicable here.
 
 
 9
 The first approach, which appears to be more suitable under the facts of the case before us, is exemplified by Sulger v. Maslin, 90 Ariz. 70, 365 P.2d 1113, 1114 (1961), in which the Arizona Supreme Court addressed a claim that the lender had received additional benefit or interest from an agreement collateral to the loan. The parties had simultaneously executed a note in the sum of $15,000 secured by a realty mortgage and entered into an agreement by which ten percent of the rental income from the mortgaged property was paid to the lenders. The borrowers contended that the rental income was consideration for the loan in addition to the eight percent interest provided for in the note and therefore that the transaction was usurious. The Arizona Supreme Court rejected the contention. It noted that the consideration recited in the rental agreement was that one of the lenders should perform certain services and that the testimony of both parties indicated that the services were performed. Id. It expressly assumed that the trial court was satisfied that the services performed were "adequate and commensurate to the rental consideration to be received in return." Id.
 
 
 10
 Thus, Sulger suggests that in determining whether the loan agreement was usurious we should consider whether the consideration supporting the ginning agreement was adequate and commensurate. See Boyd v. Head, 92 Idaho 389, 443 P.2d 473, 481 (1968) (citing Sulger as support for the proposition that "the courts have investigated the collateral transaction between the borrower and lender to determine ... if it was supported by independent consideration which was ... 'adequate and commensurate' ").[10]
 
 
 11
 The second line of cases, the one that the district court looked to, involves charges for services rendered in connection with a loan. See Altherr v. Wilshire Mortgage Corp., 104 Ariz. 59, 448 P.2d 859, 863 (1969) (processing and commitment fees); Grady v. Price, 94 Ariz. 252, 383 P.2d 173, 175-76 (1963) (brokerage fee and bonus allegedly paid for legal services); Kamrath v. Great Southwestern Trust Corp., 27 Ariz.App. 102, 551 P.2d 92, 94 (1976) (brokerage and consultation fees). Fees charged for services rendered in connection with a loan are considered additional interest if they are unreasonable. See Altherr, 448 P.2d at 863. Such charges must be limited to the specific services rendered, "and may not be made a device through which additional interest or profit on the loan may be exacted." Grady, 383 P.2d at 176. If a charge for services is unreasonable, "and the borrower is forced to accept the lender's services at an unreasonable rate in order to get the loan, then it may be said, fairly, that the excess of the fees over what would be reasonable, is a charge for the loan, and hence is interest." Altherr, 448 P.2d at 863. Accordingly, under this approach, we must assess whether the lender charged an amount greater than that which would be reasonable for the loan-related services.
 
 
 12
 We conclude that under both the-adequacy-of-consideration and reasonableness-of-the-charge-for-services approaches, S & N failed to raise a triable issue of fact. In conducting our analysis, we use net costs of ginning as our baseline--the approach urged by S & N. Because the actual ginning costs at Chickasha and at the cooperative gins are roughly comparable, and the net costs results are a product of the interplay of the actual ginning costs and the sales price of cotton seed, we also use, as did S & N, the sales price as a proxy for net cost. Although the district court rejected S & N's approach, holding that the net costs were not a proper measure of the consideration received by Casa Grande (or Chickasha), we apply it here, because we conclude that even under that approach, the defendants are entitled to summary judgment on the usury claim.
 
 
 13
 Notwithstanding the evidence as to the disparity in the net costs of ginning at the two types of ginning operations, the net ginning costs at Chickasha were sufficiently within the range of reason that the consideration must be held to be adequate and commensurate. Sulger, 365 P.2d at 1114.[11] Similarly, S & N's comparison of the transactional arrangements offered by Chickasha and the cooperative gins respectively, demonstrates that while the net cost to S & N of ginning with Chickasha was greater, it was not unreasonable. Moreover, even if S & N's comparative evidence were sufficient to raise a genuine issue of fact as to a prima facie case of usury, the defendants carried their burden on summary judgment by showing through undisputed evidence that the price that Chickasha paid for cotton seed was consistent with the overall average market price and hence both commensurate with the goods received and reasonable. Altherr, 448 P.2d at 864 ("Once it appears, prima facie, that the legal maximum interest rate is exceeded ... the burden is on the receiver of the excess to show that it represents the reasonable value of services rendered."); see Kissell Co. v. Gressley, 591 F.2d 47, 52 (9th Cir.1979). No genuine issue of fact exists, therefore, with respect to the usury issue.
 
 
 14
 Accordingly, we conclude that the district court properly granted the defendants summary judgment on the usury claim.
 
 III
 
 15
 The Bank Holding Company Act "appl[ies] the general principles of the Sherman Antitrust Act prohibiting anti-competitive tying arrangements specifically to the field of commercial banking...." Davis v. First Nat'l Bank of Westville, 868 F.2d 206, 208 (7th Cir.1989). Congress intended " 'to prohibit anti-competitive practices [by banks] which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire.' " Flintridge Station Ass'n v. American Fletcher Mortgage Co., 761 F.2d 434, 437 (7th Cir.1985) (quoting S.Rep. No. 1084, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 5519, 5535). The Act, in relevant part, prohibits a bank from conditioning the extension of credit on the requirement "that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service." 12 U.S.C. § 1972(1)(A).
 
 
 16
 * S & N alleges that Casa Grande is a bank within the meaning of the Act and that it violated the Act by conditioning its loan on the purchase of ginning services from Chickasha. The Act defines a bank as an institution organized under the laws of the United States or any state that both "(i) accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others; and (ii) is engaged in the business of making commercial loans." 12 U.S.C. § 1841(c)(1)(B).[12] Because the parties do not dispute that Casa Grande makes commercial loans, the only question is whether the deposits Casa Grande accepted were demand deposits. Accordingly, we must examine the meaning of that term.
 
 
 17
 S & N contends that demand deposits are deposits that are payable on demand regardless of the means of withdrawal. The defendants contend, and the district court concluded, that demand deposits are "non-interest bearing accounts accessed by checks offered by commercial banks." Having reviewed the statutory language, the legislative history of the most recent amendments to the statute, and the regulation promulgated by the Federal Reserve Board defining the term "demand deposit," as well as the authorities cited by the parties, we agree with S & N.
 
 
 18
 The statute does not define a demand deposit. It merely defines a bank, in part, as an institution that "accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others." By employing an "or" after "demand deposits," the statute could be read as suggesting that the type of deposits listed after the "or" are not demand deposits or it could be read as suggesting that the latter type of deposits are examples of demand deposits. Because a checking account is a demand deposit, the first alternative is not a likely one. Nevertheless, in the end, we find the arguments regarding the structure of the sentence sufficiently unpersuasive that we do not rely on them in determining the proper definition of "demand deposit."
 
 
 19
 The legislative history, however, sheds considerable light on the issue. It makes clear that the term is not used in the narrow sense urged by the defendants. Rather, it demonstrates that Congress intended the dispositive characteristic of a demand deposit to be the fact that it may be withdrawn on demand, not that it may be withdrawn by check. When Congress enacted the current statutory language, the House Conference Report explained that the term "demand deposits" was intended to include "all types of deposits that can be withdrawn on demand, regardless of the means of withdrawal." H.Conf.Rep. No. 100-261, 100th Cong., 1st Sess. 591-92 (1987). The Report further explained that "[a]ny deposit account from which funds are transferred automatically pursuant to a depositor's instructions ... is also a demand deposit." H.Conf.Rep. No. 100-261, 100th Cong., 1st Sess. 591-92 (1987).
 
 
 20
 The current regulatory definition of a demand deposit likewise makes clear that the term has a broader scope than simply "checking accounts." Under 12 C.F.R. § 204.2, whether a deposit qualifies as a demand deposit does not turn on the means of withdrawal but on the fact that withdrawal may be made on demand. The regulation defines a demand deposit as
 
 
 21
 a deposit that is payable on demand, or a deposit issued with an original maturity or required notice period of less than seven days, or a deposit representing funds for which the depository institution does not reserve the right to require at least seven days' written notice of an intended withdrawal.
 
 
 22
 12 C.F.R. § 204.2(b)(1) (emphasis added). It is true that under the regulation a demand deposit may be in the form of a checking account. See 12 C.F.R. 204.2(b)(1)(i).[13] However, a demand deposit may also take many other forms, some of which cannot be characterized as checking accounts. See 12 C.F.R. § 204.2(b)(1)(vi-viii) ("withheld taxes, withheld insurance and other withheld funds"; "time deposits that have matured or time deposits upon which the contractually required notice of withdrawal has expired"; and "an obligation to pay, on demand or within six days, a check or other instrument, device, or arrangement for the transfer of funds, drawn on the depository institution, where the account of the depositor has already been debited") (emphasis added).
 
 
 23
 The defendants' reliance on a Federal Reserve Board letter decision of November 8, 1971 is misplaced. There, the Board applied the then-applicable definition of a bank and concluded that credit balances offered by an investment company chartered under New York banking law are not demand deposits. Federal Reserve Board, November 8, 1971 Letter, 66-73 CCH Fed.Bank.L.Rep. p 95,563, at 80,533. The defendants draw our attention to the Board's conclusion that "[i]n examining the legislative history of section 2(c), the Board is persuaded that Congress meant to include in the definition of 'bank' only those institutions that offer to the public the general convenience of checking account facilities." Id.[14]
 
 
 24
 The Board's November 8, 1971 Letter decision is not controlling. First, in that letter, the Board addressed the narrow issue of whether credit balances offered by investment companies chartered under New York banking law are demand deposits. Those companies were allowed to accept credit balances "only as an incident to transactions that it [wa]s legally permitted to perform for its customers," and the credit balances were "not permitted to be used in the manner of a checking account for purposes other than to make payments in connection with the importation or exportation of goods." Id. Second, and more important, the Board's decision predates by a considerable period the 1987 amendments and the regulations, and it is no longer clear that even credit balances are excluded. The legislative history of the amendments as well as the current regulatory definition lead us to conclude that whatever the circumstances in 1981 demand deposits are today no longer limited to checking accounts.
 
 
 25
 Thus, consistent with the legislative history and the regulatory definition, we hold that the district court erred in determining that a deposit is not a demand deposit simply because it is not in a checking account. Instead, we conclude that whether a deposit may be withdrawn on demand, "regardless of the means of withdrawal," H.Conf.Rep. No. 100-261, 100th Cong., 1st Sess. 591-92, or is payable on demand, 12 C.F.R. § 204.2(b)(1), is the pertinent question. Under this standard, it is clear that the deposits held by Casa Grande were demand deposits. Although there was no formal written agreement between the parties, Casa Grande's oral policy was to allow a depositor to withdraw funds as needed.[15] Moreover, Casa Grande permitted funds to be transferred from these accounts to third parties through disbursement forms. Accordingly, S & N established that Casa Grande was a bank within the meaning of the Bank Holding Company Act.
 
 B
 
 26
 Because it held that Casa Grande was not a bank, the district court did not reach the question whether S & N established that Casa Grande's conditioning of the loan on S & N's entry into a ginning agreement constituted an unlawful tying arrangement under § 1972 of the Bank Holding Company Act. While we disagree with the district court's reason for granting summary judgment, we may nonetheless affirm on any ground that appears in the record. This case, however, is not an appropriate one in which to do so. The record before us is sparse, at best. We have held that "an appellate court may, in the interests of sound judicial administration, vacate a summary judgment without reaching the merits of the issue if the record has not been sufficiently developed to allow for a fully informed decision." Tovar v. United States Postal Svc., 3 F.3d 1271, 1278 (9th Cir.1993); see Anderson v. Hodel, 899 F.2d 766, 770 (9th Cir.1990). There is even more reason not to reach the merits of an alternate ground that has not been considered by the district court.
 
 
 27
 To establish a violation of § 1972, a plaintiff must show that "(1) 'the banking practice in question was unusual in the banking industry,' (2) 'an anti-competitive tying arrangement' existed, and (3) 'the practice benefits the bank.' " Bieber v. State Bank of Terry, 928 F.2d 328, 330 (9th Cir.1991) (quoting Rae v. Union Bank, 725 F.2d 478, 480 (9th Cir.1984)).[16] We conclude that on the basis of the record before us, the record is insufficiently developed as to two of the three requirements.[17]
 
 
 28
 As to the question whether the conditions placed on the loan were unusual in the banking industry, the record discloses that financing practices in the cotton industry are different from those in many other industries, and gives us a glimpse into what goes on behind the cotton curtain. However, the facts in the record are wholly inadequate to permit us to answer the question before us. We conclude that neither side made a sufficient showing on this issue to warrant a determination in its favor.
 
 
 29
 As to the second issue, the existence of an unlawful tie-in, the parties disagree on a number of legal points that it may be helpful to clarify. "A tie-in is 'an arrangement by one party to sell one product (the 'tying product'), but only on the condition that the buyer also purchase a different ... product (the 'tied product'), or at least agree that he will not purchase that product from another supplier.' " Davis, 868 F.2d at 208 (citation omitted). Although the Bank Holding Company Act applies general antitrust principles, a plaintiff claiming an unlawful tie-in under § 1972, unlike a plaintiff claiming a violation under the general antitrust statutes, need not establish the anti-competitive effects of the tie-in or the market share that the defendant possesses. "In light of th[e] unique economic role that banks play, Congress perceived conditional transactions involving credit as inherently anti-competitive ... [and] intended to regulate conditional transactions in the extension of credit by banks more stringently than had the Supreme Court under the general antitrust statutes." Dibidale of Louisiana, Inc. v. American Bank & Trust Co., 916 F.2d 300, 305 (5th Cir.1990) (citations omitted). "Central to this more stringent regulation of the banking industry was Congress's decision to exclude from the bank anti-tying provisions the market share and anti-competitiveness requirements which were the cornerstone of tying claims under the general antitrust statutes." Id.; see, e.g., Integon Life Ins. Corp. v. Browning, 989 F.2d 1143, 1151 (11th Cir.1993); Palermo v. First Nat'l Bank & Trust Co., 894 F.2d 363, 368 (10th Cir.1990); Amerifirst Properties, Inc. v. FDIC, 880 F.2d 821, 826 (5th Cir.1989); Davis, 868 F.2d at 208.[18] Thus, while our test speaks in terms of an "anti-competitive" tying, the modifier either drops out or is presumed to exist. The deletion from the test of the misleading term "anti-competitive" or the substitution of the word "unlawful" might be helpful.
 
 
 30
 There is one remaining issue regarding tying that we should mention briefly. Although Casa Grande expressly conditioned its offer of financing on S & N's purchasing ginning services at the Chickasha gins, the defendants contend that financing and ginning are not separate products. The question whether one or two separate products are involved turns "on the character of the demand for the two items." Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 19, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2 (1984); see McGee v. First Fed. Sav. & Loan Ass'n, 761 F.2d 647, 648 (11th Cir.1985) (finding that loan and loan-related appraisal services are not two products because "[t]here is no legitimate consumer demand by a borrower to purchase loan-related appraisal services separate from the purchase of the loan itself").
 
 
 31
 In Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 472, 112 S.Ct. 2072, 2080, 119 L.Ed.2d 265 (1992), the Court stated, "For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts." It noted that the record indicated that service and parts had been and still were sold separately, and that at least some consumers would purchase service without parts and some consumers would purchase parts without service. Id. It therefore concluded that "[e]nough doubt is cast on Kodak's claim of a unified market that it should be resolved by the trier of fact." Id.
 
 
 32
 The status of the record here is similar to that in Kodak. It suggests that some firms provide only financing while others provide only ginning services. Chickasha itself estimated that twenty-five percent of its ginning customers do not receive financing from Casa Grande. Thus, there is enough doubt in the record regarding whether a legitimate consumer demand exists for ginning services without loans and vice versa, that we should not attempt to decide the defendants' claim of a unified market here.
 
 
 33
 The issue of whether a violation occurred is in this case primarily a factual one. It may turn in part on a careful examination of the practices, practicalities, and economics of the cotton industry. This is the type of matter which is best examined in the first instance by the district court upon a fuller record.
 
 CONCLUSION
 
 34
 For the reasons stated, the district court order granting the defendants' motion for summary judgment on the usury claim is AFFIRMED, but the order granting summary judgment on the Bank Holding Company Act claim is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.
 
 
 35
 AFFIRMED in part, REVERSED in part and REMANDED.
 
 
 
 *
 The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Cotton ginning and merchandising firms, rather than regular commercial banks, are the major lenders in the Arizona cotton economy
 
 
 [2]
 S & N defaulted on the loans and filed for bankruptcy
 
 
 [3]
 We refer to the Chickasha-owned gins simply as "Chickasha," hereafter
 
 
 [4]
 The defendants contend that the practice of conditioning loans on ginning at gins owned by the lender has existed in Arizona for more than 50 years
 
 
 [5]
 The ginning process yields cotton fiber and cotton seed. Chickasha is in the business of extracting oil from cotton seed
 
 
 [6]
 The credit accounts, which Casa Grande apparently no longer maintain, were not insubstantial. The record shows that Casa Grande at one point held $5 million in these accounts
 
 
 [7]
 According to a deposition submitted by S & N, Jack Walker, Finance Manager for Casa Grande, represented: "I could deposit money into an account, collect prime interest. I could come and get it as I pleased." When asked in his deposition what he told customers, Walker stated, "That they could get their money back as they needed it, I guess."
 
 
 [8]
 The Arizona courts have not decided a case that required them to determine whether the usury provisions prohibit the lender from receiving more interest than the borrower agrees to pay in writing. However, one Arizona court has recognized that the construction adopted by the district court is plausible, Wieman v. Roysden, 166 Ariz. 281, 802 P.2d 432, 437 (Ct.App.1990) (stating, in context of sanctions against attorney who raised defense of usury, that "it is certainly arguable that the interest rate which is 'permitted by law' under § 44-1202 is that rate which the parties have 'contracted for in writing' under § 44-1201(A)"), and it certainly seems so to us
 
 
 [9]
 It is immaterial that the additional interest, if any, flowed to Chickasha rather than Casa Grande because the latter entity is a wholly-owned subsidiary of Chickasha. In determining whether a transaction is usurious, Arizona courts look at the substance of the transaction, not its form. Modern Pioneers Ins. Co. v. Nandin, 103 Ariz. 125, 437 P.2d 658, 663 (1968). Accordingly, in Kamrath v. Great Southwestern Trust Corporation, 27 Ariz.App. 102, 551 P.2d 92 (1976), the court held a transaction usurious although the additional interest was received not by the lender but by other corporations that were a part of the same corporate conglomerate
 
 
 [10]
 Such an analysis is consistent with the Restatement approach to collateral bargains. See Restatement of Contracts § 528 (1932). The Restatement states:
 A bargain accompanying and collateral to a bargain for a loan of money ..., if providing for only a fair equivalent to the creditor for the consideration that he gives, is not taken into account in computing the creditor's profit, in order to determine whether the bargain for a loan ... is usurious, unless his intention is to secure a greater profit for the loan ... than is allowed by law.
 Id. (emphasis added).
 However, the Restatement also considers whether the lender profited more from the collateral transaction than it otherwise would have. The comment states:
 [t]he fact[ ] that a collateral bargain involves some profit to the lender and that the loan ... would not have been made without the collateral bargain is not alone enough to make the transaction usurious. The advantage that the creditor derives from the collateral bargain must be greater than would be normally derived therefrom if it were an independent transaction....
 Id.
 
 
 [11]
 S & N fares no better under the alternative Restatement approach because it offered no evidence that Chickasha would have profited less from the ginning agreement if S & N had not received financing from Casa Grande. See supra n. 10
 
 
 [12]
 Chickasha owns all of the stock in Casa Grande. Accordingly, if Casa Grande is a bank within the meaning of the Bank Holding Company Act, Chickasha is a bank holding company. See 12 U.S.C. § 1841(a)(1) & (2) (defining a bank holding company as any company that directly or indirectly owns "25 percent or more of any class of voting securities of the bank")
 
 
 [13]
 The defendants cite a number of cases and treatises that describe a checking account as a demand deposit. However, apart from one citation, Jeffrey M. Rosenberg, Dictionary of Banking 107 (1993), defendants provide no citation suggesting that a demand deposit must be a checking account. Its citations generally describe checking accounts as the "usual form" of a demand deposit. See, e.g., Pauline B. Heller, Federal Bank Holding Company Law § 1.02, at 1-21 (1991). Moreover, most of its citations predate the 1987 amendment and the current regulation
 
 
 [14]
 We note that "[t]he Board has recognized that it is not necessary for a bank to engage in all of the usual banking activities in order to come within the definition of a 'bank.' " Pauline B. Heller, Federal Bank Holding Company Law § 1.02[a], at 1-11 n. 2.2 (1991) (citing Citicorp/Citibank South Dakota, 67 Fed.Res.Bull. 181 (1981) (bank would not accept deposits from the general public))
 
 
 [15]
 Although in their response to S & N's request for admissions, the defendants stated that the timing of such payment was at Casa Grande's discretion, we find no evidence in the record supporting this contention
 
 
 [16]
 Accord Cohen v. United American Bank of Cent. Florida, 83 F.3d 1347, 1350 (11th Cir.1996); NCNB Texas Nat'l Bank v. Johnson, 11 F.3d 1260, 1268 (5th Cir.1994); Alpine Elec. Co. v. Union Bank, 979 F.2d 133, 135 (8th Cir.1992); Sanders v. First Nat'l Bank & Trust Co., 936 F.2d 273, 278 (6th Cir.1991)
 
 
 [17]
 On the third issue, a plaintiff must create a triable issue as to whether the bank benefitted from the tying. This burden is not an onerous one. Indeed, the Fifth Circuit presumes that the bank benefits from the tie-in. NCNB, 11 F.3d at 1268. We need not go so far here, however. In determining whether the tying arrangement benefitted Casa Grande, we note that the loan was tied to an agreement with its parent company. By linking financing to ginning, Casa Grande effectively created customers for Chickasha's ginning services. In such circumstance, the benefit from the tying arrangement is apparent
 
 
 [18]
 Relying on Sports Form, Inc. v. United Press International, Inc., 686 F.2d 750, 754 (9th Cir.1982), the defendants contend that S & N must show "some modicum of coercion" to make out an unlawful tying. Although some showing of coercion may be required under the Clayton Act and the Sherman Act, as this court apparently held in Sports Form--Sports Form does not specify the statute under which the claim was brought--it is not a requirement under the Bank Holding Company Act. See Dibidale, 916 F.2d at 306 ("Unlike the general marketplace where the power to coerce a consumer to accept a tying arrangement is directly related to the market power of the proposed coercer, in the banking industry the power to coerce is inherent in the banking relationship itself, regardless of an individual bank's market power.")